979 A.2d 98

Douglas M. ARMSTRONG et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE et al.

No. 106, Sept. Term, 2008.

Court of Appeals of Maryland.

July 23, 2009.

Reconsideration Denied Oct. 2, 2009.

J. Carroll Holzer (Holzer & Lee, Towson), on brief, for petitioners.

Sandra R. Gutman, Chief Solicitor (George A. Nilson, City Solicitor, Baltimore), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA,* JOHN C. ELDRIDGE (Retired, specially assigned) and IRMA S. RAKER, (Retired, specially assigned), JJ.

HARRELL, Judge.

The land use dispute engendering the present case (and its predecessors,[1] contemporaries,[2] and what may come yet[3]) represents Baltimore City's version of the Hundred Years' War.[4,5] The present skirmish involves the interpretation and application of the term "family" as defined by the Baltimore City Zoning Code ("the Code" or "BCZC").

---

* Barbera, J., participated in the hearing and conference of this case, but recused herself prior to the adoption of this opinion.

1. *Armstrong v. Baltimore*, 390 Md. 469, 889 A.2d 399 (2006); *Armstrong v. Mayor of Balt.*, 169 Md.App. 655, 906 A.2d 415 (2006); *see also Armstrong v. Bd. of Mun. & Zoning Appeals*, No. 02525, September Term, 2004, 169 Md.App. 736 (Md. Ct. Spec.App. filed 25 August 2006); *Mayor of Balt. v. Armstrong*, No. 02096, Sept Term, 2003, 163 Md.App. 704 (Md. Ct. Spec.App. filed 10 August 2005).

2. *Armstrong v. Mayor of Balt.*, 409 Md. 648, 976 A.2d 349 (2009).

3. A separate, related dispute concerning Petitioners' challenge to a parking ordinance passed by the City Council is pending in the Court of Special Appeals. *Armstrong v. Mayor of Balt.*, No. 01682, September Term, 2008.

4. The Hundred Years' War (1337–1453) was a prolonged series of conflicts between the royal Houses of Valois and Plantagenet, each vying to rule France after the extinction of the Capetian line of French kings. The House of Valois (the ultimate victors) were native French. The Plantagenets were French–English and ruled England at the time. The Hundred Years' War gave history Joan of Arc. The instant case also has a central figure named Joan (one of the Petitioners), who, like her saintly antecedent, faithfully presses her cause, having battled the Mayor and City Council of Baltimore numerous times. Although Joan of Arc suffered an unfortunate fate, her principals, the House of Valois, ultimately succeeded. As this case probably will not be the last combat between these litigants, time will tell whether the modern Joan ultimately will hoist the banner of victory in the war over the Cresmont Loft apartment building.

5. This is not the first time a comparison to the Hundred Years' War has seemed merited in a land use dispute. *See Sharp v. Howard County*, 98 Md.App. 57, 59, 632 A.2d 248, 249 (1993).

The Code provides that a "dwelling unit" may be occupied by no more than one "family." Four unrelated individuals (and no more) who live together comprise a "family," if they form a "single housekeeping unit." This case requires us to determine whether four unrelated individuals satisfy the Code's definition of "family," where each individual has a separate lease agreement with the landlord to rent one bedroom in a suite that consists of four bedrooms and a common area with a bathroom and kitchen facilities. In answering that question, we must interpret and apply the phrase "single housekeeping unit," which is the only relevant term the Code does not define. For reasons we shall explain, we effectively shall affirm the decision of the Board of Municipal and Zoning Appeals of Baltimore City (the "Board"), which concluded that such a living arrangement satisfies the Code's definition of "family."

## I.

Cresmont Properties Ltd. ("Cresmont") owns a 28,132 square-foot parcel of land (the "Property") located at 2807–35 Cresmont Avenue in Baltimore City.[6] Petitioners, a group of neighborhood residents opposed to Cresmont's development of and particular use established on the Property, challenge here the last of three construction permits, as well as an occupancy permit, issued to Cresmont by the Baltimore City Department of Housing and Community Development ("DHCD") for a multi-unit residential building known as Cresmont Loft. The labyrinthine history of this litigation is as follows.

### The First Construction Permit

On 15 November 2002, the Zoning Administrator for DHCD issued to Cresmont a permit to construct a seven-story residential apartment building, consisting of twenty-six dwelling units and an adjacent parking lot with thirty-three parking spaces.[7] At the time, the Property was a vacant lot. Petition-

---

6. Cresmont is not a party to the case before us.

7. It appears that Cresmont saw as the principal market for its units the student body at The Johns Hopkins University's Homewood Campus.

ers filed a negative appeal[8] to the Board. They alleged that the project violated Section 10–504(a) of the Code, which requires that an ordinance be adopted by the Mayor and City Council (the "City") to authorize the use of land as a parking lot.[9] The Board ruled against Petitioners, reasoning that Section 10–504(a) did not apply to accessory off-street parking for newly-erected structures. Thus, construction of the Cresmont Loft building and parking lot began in August 2003.

On 4 November 2003, however, the Circuit Court for Baltimore City, upon Petitioners' petition for judicial review of the Board's decision, reversed the Board, noting that the Code did not exempt an accessory use from the requirements of Section 10–504(a). Shortly thereafter, the Director of Permits for DHCD revoked Cresmont's construction permit. The City, siding with Cresmont, appealed the Circuit Court's judgment to the Court of Special Appeals. The intermediate appellate court, in an unreported decision, dismissed the appeal on the ground that the provision of the Code authorizing judicial review by the Court of Special Appeals was not in effect when the City filed its appeal.[10] *Mayor of Balt. v. Armstrong*, No. 02096, September Term, 2003, 163 Md.App. 704 (filed 10 August 2005).

### The Second Construction Permit

On 6 January 2004, while the appeal concerning the first construction permit was pending in the intermediate appellate

---

8. Negative appeals are "[a]ppeals to prohibit buildings or uses, permits for which have been approved or issued by the Zoning Administrator [of Baltimore City]." *See* Department of Municipal and Zoning Appeals, Rules Relative to Appeals from the Action of and Applications Referred by the Zoning Administrator, para. 6.

9. Section 10–504(a) provides:
 In the Parking Lot Districts, no land may be used as a parking lot nor may any building be razed so as to permit the use of the land as a parking lot unless authorized by an ordinance of the Mayor and City Council.

10. The right to appeal to the Court of Special Appeals is provided by Section 17–305 of the Code, which became effective 10 May 2004.

court, DHCD issued to Cresmont a second construction permit, as the earlier one had been revoked following the Circuit Court's November 2003 order. Construction resumed about two weeks later. Petitioners filed a negative appeal to the Board, asking the Zoning Administrator to stay construction during the pendency of their negative appeal.[11] They relied on Section 17–203 of the Code, which provides that "an appeal stays all proceedings in furtherance of the action appealed from." The Zoning Administrator refused their request, informing them that continuation of construction is not a "proceeding." Petitioners then noted an appeal to the Board from the Zoning Administrator's refusal to stay construction.

The Board heard both matters in March 2004. Shortly thereafter, the Board rendered its decision, agreeing with Petitioners that the second construction permit was issued unlawfully; however, it determined that Petitioners were not entitled to a stay of construction. Petitioners filed a petition for judicial review in the Circuit Court. The City filed a motion to dismiss, claiming that Petitioners' petition was moot, as the second permit had been revoked pursuant to the Board's decision. The Circuit Court agreed with the City and dismissed the petition. Petitioners appealed to the Court of Special Appeals, which reversed the Board in another unreported opinion. *Armstrong v. Bd. of Mun. & Zoning Appeals,* No. 02525, September Term, 2004, 169 Md.App. 736 (filed 25 August 2006). The intermediate appellate court opined that the question regarding the stay was an exception to the mootness doctrine because it was a matter of public importance that consistently might evade judicial review of the merits. On the merits, the Court of Special Appeals held that

---

**11.** Petitioners also filed in the Circuit Court a petition seeking an *ex parte* injunction, a final injunction, and a finding of contempt of court. They asserted that DHCD's issuance of the second permit violated the Circuit Court's November 2003 order reversing the Board's decision to affirm the first construction permit. In a 2 February 2004 order, the Circuit Court denied the petition on the basis that the November 2003 decision was on appeal; however, the court warned Cresmont and the City that "[t]he continuing construction at 2807–2835 Cresmont Avenue is proceeding upon a legally unstable foundation."

construction should have been halted when Petitioners filed their negative appeal to the Board from the issuance of the second permit.

*The Third Construction Permit & The Occupancy Permit*

In March 2004, while the negative appeal of the second permit was pending before the Board, the City passed, at Cresmont's request, the ordinance apparently needed to allow the thirty-three off-street parking spaces that Cresmont desired on the Property. One month later, DHCD issued to Cresmont a new construction permit. In May 2004, Petitioners noted a negative appeal to the Board in which they objected to the new permit on the ground that the project, if developed and used as Cresmont intended, would exceed the allowable dwelling unit density in the B–3–2 Community Commercial District in which the Property is located.[12] Construc-

---

12. Petitioners also filed two actions in the Circuit Court challenging passage of the parking ordinance by the City. First, they filed suit under Maryland Code (1984, 2004 Repl. Vol.), State Government Article, § 10–501 *et seq.*, the "Open Meetings Act," charging violation thereof and urging voidance of the ordinance and the award of attorneys' fees. Second, they filed suit pursuant to Maryland Code (1957, 2003 Repl. Vol.), Article 66B, § 2.09(a)(1), which provides a right of judicial review for any person aggrieved by a "zoning action" by the City Council.

On 13 August 2004, the court dismissed Petitioners' action under Article 66B, reasoning that it did not have jurisdiction because adoption of the ordinance did not constitute a "zoning action." Petitioners appealed to the Court of Special Appeals. The City moved to dismiss the appeal in the intermediate appellate court, under Maryland Rule 8–602(a)(1),· as an appeal "not allowed by these rules or other law," reiterating its argument that the ordinance did not constitute a "zoning action" under Section 2.09(a)(1) of Article 66B. The intermediate appellate court agreed and dismissed the appeal in yet another unreported opinion. *Armstrong v. Balt. City,* No. 01704, September Term, 2004 (Md. Ct. Spec.App. dismissed 14 March 2005). On a successful petition for writ of certiorari, we remanded the case to the Court of Special Appeals, pointing out that, because the Circuit Court entered a final appealable judgment, the intermediate appellate court had appellate jurisdiction to consider the issue of whether the Circuit Court had jurisdiction in the first instance. *Armstrong v. Baltimore,* 390 Md. 469, 475, 889 A.2d 399, 403 (2006).

On remand, the Court of Special Appeals reversed the Circuit Court, reasoning that the zoning ordinance authorizing a parking lot on the

tion on the Property, however, continued notwithstanding the appeal (having started again pursuant to the second construction permit issued in January), and, in August 2004, DHCD issued to Cresmont an occupancy permit for twenty-six dwelling units on the Property. Shortly thereafter, Petitioners noted another negative appeal to the Board, this time challenging the issuance of the occupancy permit.

On 23 November 2004, nearly two months after the completion of the construction of Cresmont Loft, the Board held a hearing on Petitioners' negative appeal of the construction permit issued in April of that year. Petitioners' negative appeal of the occupancy permit, however, remained pending. At the hearing, Petitioners argued that the Property was not going to house the twenty-six dwelling units for which the construction permit was issued. Although there were twenty-six four-bedroom suites, Petitioners urged that the suites were not dwelling units. They claimed that the developer intended

---

Property "ha[d] the characteristics of a conditional use." *Armstrong v. Mayor of Balt.*, 169 Md.App. 655, 672, 906 A.2d 415, 425 (2006). Accordingly, the act of the City Council was administrative in nature and subject to judicial review as a "zoning action" under Section 2.09(a)(1) of Article 66B. *Id.* at 674, 906 A.2d at 426. On remand to the Circuit Court, the trial judge dismissed the petition for mootness, in light of a subsequent ordinance passed by the City that amended the definition of a "parking lot" to exclude accessory parking. The neighbors again appealed to the Court of Special Appeals; that case remains pending at this time. *Armstrong v. Mayor of Baltimore*, No. 01682, September Term, 2008.

Petitioners' suit under the Open Meetings Act took a different path because it had not been consolidated with their Article 66B challenge dismissed by the Circuit Court. In June 2003, the court determined that the passage of the ordinance violated the Open Meetings Act and awarded an undetermined amount of attorneys' fees to Petitioners, but also granted summary judgment in favor of the City because, so the court determined, the ordinance was not voidable merely because of the Open Meetings Act violation. Petitioners and the City appealed to the Court of Special Appeals, which affirmed in part and reversed in part in an unreported opinion. *Armstrong v. Mayor of Balt.*, No. 01243, September Term, 2005, 175 Md.App. 762 (Md. Ct. Spec.App. filed 2 July 2007). The successful petition for writ of certiorari in that case is decided by this Court in a companion opinion to the present one. *Armstrong v. Mayor of Balt.*, 409 Md. 648, 976 A.2d 349 (2009).

to lease separately each of the four bedrooms in each of the suites. Thus, as this argument proceeded, the Property actually housed 104 individual "rooming units." [13]

Cresmont countered that each of the twenty-six suites satisfied the Code definition of a "dwelling unit." [14] A "dwelling unit," Cresmont observed, is a rental unit that contains a bathroom, kitchen facilities, and is occupied by a "family." [15] Cresmont proffered that the tenants of each suite would constitute a "family," despite having separate leases, because they would be "living together as a single housekeeping unit," as required by the Code definition of "family." Thus, accord-

---

**13.** Section 1–186 of the Code provides:
(a) *In general.*
"Rooming unit" means a room or suite of rooms in a house or other building that is rented as living and sleeping quarters, but without cooking facilities.
(b) *Suite of rooms.*
In a suite of rooms, each room that provides sleeping accommodations is counted as 1 rooming unit for purposes of this article.

**14.** The Code defines "dwelling unit" as "1 or more rooms in a dwelling that: (1) are used as living quarters for occupancy by 1 family; and (2) contain permanently installed bathroom and kitchen facilities reserved for the occupants of the room or rooms." BCZC § 1–137.

**15.** Section 1–142 of the Code provides:
(a) *In general.*
"Family" means one of the following, together with usual household helpers:
(1) an individual;
(2) or more people related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit; or
(3) a group of not more than 4 people, who need not be related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit.
(b) *Roomers included.*
"Family" includes, with respect to those listed in subsection (a)(1) or (2) only, up to 2 roomers within the dwelling unit, as long as:
(1) they share a common entrance and cooking and bathroom facilities; and
(2) in the case of a multiple-family dwelling, no more than 2 roomers are in the entire dwelling, regardless of the number of dwelling units.[ ]
(c) *Exclusions.*
In no case, does more than 4 unrelated people, a rooming house, a hotel, or a fraternity or sorority house constitute a family.

ing to Cresmont, the project complied with the construction permit's allowance of twenty-six dwelling units.

Petitioners also complained that a fence erected by Cresmont restricted unlawfully their access to an alley[16] of common use. They also asserted that the location of a transformer on the Property violated the rear yard requirements of Section 6–412(e) of the Code, which call for a minimum yard size of 30 feet deep in the zone, and that enclosure of the transformer by a visual screen was required by Section 6–405(c)(1) of the Code.[17] Cresmont responded that it owned the alley in question, which was closed to the public by an ordinance passed by the City, and that it was otherwise in compliance with the provisions of the Code cited by Petitioners.

At the hearing, Petitioners introduced several of Cresmont Loft's promotional materials which made clear that Cresmont intended to rent the twenty-six suites to a total of 104 individual tenants. One advertisement listed a total of 104 "units" available for rent. A website provided that "[e]ach unrelated resident will sign a separate lease." Petitioners also introduced the affidavit of a "potential tenant" who inquired about renting at Cresmont Loft. She stated that "[t]he woman who answered the phone said, 'You have to understand that [you] would only be renting the bedroom.'"

The Cresmont Loft standard lease agreement was also introduced. The lease was a form with certain blanks to be filled-in; the beginning and ending dates of the tenancy were to be inserted, among other terms. In pertinent part, the agreement provided:

---

16. The Code defines an "alley" as "a way, other than a street, that: (1) is open to common use; and (2) affords a secondary means of vehicular access to adjoining or adjacent property." BCZC § 1–108.

17. The Code requires screening "for any use that is not conducted wholly within an enclosed structure if the use: (i) either adjoins or is within 100 feet of a lot in a Residence or Office–Residence District; and (ii) is visible from the ground level of the Residence or Office–Residence District." BCZC § 6–405(c)(1).

Description of Leased Premises: 2807 Cresmont Avenue, Apartment # ____, Bedroom # ____ Baltimore, Maryland 21211

It is understood that the Tenant's premises consists of the exclusive use and occupancy of the dwelling unit described above, including the sole use of Bedroom # ____ and the shared use and occupancy of the bathroom(s), kitchen and living/dining areas with the other co-tenants of Apartment # ____ (the "Premises").

. . . .

Tenant shall be liable for and shall pay all costs and expenses for damage to the bedroom leased by Tenant (including, but not limited to, replacement or repair of all broken or damaged furnishings or fixtures, and any deface-ment of or damage to walls, ceilings, floors and doors), regardless of whether such damage is caused by Tenant or Tenant's guests or invitees. It is understood that Tenant will be occupying an apartment unit with other co-tenants, and Tenant shall also be held liable for a pro-rata share of any damages to the common areas of the apartment unit and its furnishings, fixtures, walls, ceilings, floors, and doors unless the party solely responsible for any such damage can be reasonably ascertained. The cost of repairing any such damage/repair shall be specifically deemed additional rent. Accordingly, Tenant must exercise responsibility to see that the entire apartment unit is maintained in good order and repair. No rent payment shall be reduced or offset for Tenant-incurred expenses under any circumstances whatso-ever, except as otherwise required by law.

. . . .

It is understood that the apartment unit in which the Premises are located contains one or more bedroom(s) in which other co-tenant(s) may reside. For purposes of oper-ating efficiency, Landlord reserves the right, upon fifteen (15) days' written notice, when possible, to require Tenant to change bedrooms within the apartment unit as well as the right to relocate Tenant to another apartment unit within the Cresmont Loft apartment building. Landlord also re-

serves the right to assign tenants to other bedrooms in the apartment unit in which the Premises are located. Landlord, to the extent practical, will honor tenants' requests for the sharing of a particular apartment unit. Upon any Tenant's request for relocation, a new security deposit may be required. In no event shall Landlord (regardless of the negligence of the Landlord) be held responsible for problems or disagreements arising out of any difference in personality, style of living, etc. among co-tenants.

Joan Floyd, one of the Petitioners, also testified that a fence erected by Cresmont restricted public access to a twenty-foot-wide right-of-way, which she characterized as an alley of long public use. Ms. Floyd's garage abuts a ten-feet-wide alley to which the right-of-way in question previously provided vehicular access. According to her, she could no longer drive her car in or out of her garage.

In February 2005, the Board issued a written decision affirming the issuance of the third construction permit. The Board recounted Petitioners' arguments, but concluded summarily that the construction permit was issued properly. Petitioners filed in the Circuit Court a petition for judicial review, claiming that the Board did not hold a public deliberation and vote and that the Board's decision did not include the required findings of fact or conclusions of law explaining the basis for its decision. On 17 November 2005, the Circuit Court remanded the matter to the Board to "publicly deliberate on said record, issues, testimony, and evidence, [ ] vote in public, and [ ] render a decision in writing, setting forth its findings of fact and conclusions of law." Pursuant to the court's order, the Board held a public deliberation and vote on 7 March 2006, at which it affirmed the issuance of the construction permit.

On the same day, the Board conducted a hearing on Petitioners' negative appeal of the August 2004 occupancy permit. Petitioners argued, as they did at the hearing on their negative appeal of the third construction permit, that the twenty-six suites did not qualify as dwelling units because the tenants

renting them were not "families." They entered into evidence the same materials from the hearing on the appeal of the third construction permit. Cresmont presented the testimony of Brian Swift, the Director of Property Management for the company that manages Cresmont Loft. According to Swift, all leases are for a term of one year,[18] and all tenants in a suite are equally "responsible for the care and maintenance of the apartment unit." He acknowledged that "the leases are tied to each individual bedroom"; however, he claimed that each tenant has "the exclusive use to that entire four bedroom unit." The Board publicly deliberated and voted to affirm the issuance of the occupancy permit.

On 23 June 2006, the Board issued written decisions denying Petitioners' appeal of the occupancy permit and, again, denying their appeal of the April 2004 construction permit. In its decision on the occupancy permit, the Board concluded:

Based on the evidence presented and the application of the relevant provisions of the Zoning Code, the Board makes the following findings of fact and conclusions of law.

1. The Board finds that each apartment constitutes a separate unit with each having four bedrooms, kitchen facilities, two bathrooms, and a living area and dining area. The Board finds that the above arrangement

---

**18.** Petitioners allege in their reply brief that Mr. Swift's testimony—that the leases at issue are for a term of one year—was "self-contradictory." They direct us to the following exchange, which occurred while one of the Petitioners, Ms. Floyd, cross-examined him:

> Q What I'm showing Mr. Swift is an advertisement from the Apartment Shoppers Guide. . . . And here's a chart and it indicates that Cresmont—is available for short-term leasing. So I guess my question for Mr. Swift is, is this—is this just one—i[s] this—
> A The column indicates short-term or corporate. We have no objection to [a] corporate lease, which would mean that a company would lease the apartment for people who would be residing while they were in town for that. It doesn't necessarily mean it has to [be] short-term. All of our leases are for a one-year period of time.

Petitioners, however, do not explain how the above testimony was self-contradictory. Nor did they, when cross-examining Swift, adduce further information from him tending to show that Cresmont Loft's leases are for terms less than one-year.

complies with the definition of a "Dwelling Unit" as stated in Section 1–137 of the Zoning Code.

2. The Board finds that under the definition of "Family" as stated in Section 1–142 of the Zoning Code, each dwelling unit may have up to four unrelated people living together as a single housekeeping unit within the dwelling unit. As a result, the Board finds that even though the four occupants of a dwelling unit have separate leases with the lessor, such arrangement does not alter the fact that they are living together as a single housekeeping unit where the testimony established that they would be sharing normal household responsibilities such as cooking, cleaning and other related household duties.

As a result, the Board finds that the use of each of the dwelling units by four unrelated people who live together as a single housekeeping unit in a dwelling unit complies with the definition of "family" in Section 1–142 of the Zoning Code.

3. Upon reviewing the record and the issues presented, and after considering the testimony and evidence, the Board finds that Permit No. COM2004–19844 [the occupancy permit] was issued in accordance with the relevant provisions of the Zoning Code and thus sustains the action of the Zoning Administrator in approving the issuance of the permit.

Petitioners filed in the Circuit Court a petition for judicial review, claiming that the Board erred in determining that four unrelated individuals with separate leases constitute a "family" and that the Board erred in failing to determine that the occupancy permit was issued in violation of Section 2–404(a) of the Code, which prohibits the issuance of occupancy permits before construction is complete.

The written decision regarding the construction permit, however, prompted Petitioners to write to the Board's executive director and again complain that the decision, like the earlier one, was insufficient for purposes of meaningful judicial

review. Petitioners alleged that the decision did not address all of the issues put before the Board. They indicated that they would file a petition for judicial review asking the Circuit Court to remand the matter for the Board to make further findings of fact and conclusions of law, unless the Board rendered a new decision in which it did those things sufficiently. The Board acquiesced and convened another public deliberation and vote in September 2006.

On 2 November 2006, the Board issued its third (and final) written decision affirming the issuance of the April 2004 construction permit. In pertinent part, the Board concluded:

1) The Board finds that the use of the property cannot be considered 104 rooming units. The arrangement of the units each with four bedrooms and a kitchen providing cooking facilities to the occupants does not fit with the definition of "rooming unit" under Section 1–186 of the Zoning Code.

2) The Board finds that under the definition of "Family" as stated in Section 1–142 of the Zoning Code, each dwelling unit may have up to four unrelated people living together as a single housekeeping unit within the dwelling unit. The Board finds that even though the four occupants of a dwelling unit have separate lease agreements with the lessor, such arrangements do[ ] not alter the fact that they are living together as a single housekeeping unit. As a result the Board finds that the use of each of the dwelling units by four unrelated people who live together as a single housekeeping unit in a dwelling unit complies with the definition of "Family" in Section 1–142 of the Zoning Code.

. . . .

6) The Board finds that this structure contains 26 dwelling units, with each having four bedrooms, kitchen facilities, two bathrooms, and a living and dining area. The Board finds that the units comply with the definition of a "Dwelling Unit" as stated in Section 1–137 of the Code.

7) The Board finds that the Negative Appellants raised concerns about two separate alleys. The previous use of 2807–35 Cresmont was several groups of one story garages that contained a variety of uses and tenants. There was a 20 foot wide by 119 foot alley that served these garages. This alley did not serve as a secondary means of vehicular access to the properties fronting on Howard Street or W. 29th Street.

The garages were razed several years ago and the lot became unimproved.

The alley was closed per Ordinance No. 03–548 and the area was consolidated into the 2807–35 Cresmont Avenue lot.

The other alley in question is the alley in the rear of the properties fronting on the 2800 block of N. Howard Street. Ms. Joan Floyd testified that the development plan constricts, reduces and obstructs public use of the rear alley in this block. Ms. Floyd submitted photographs of the alley prior to the demolition of the garages; a copy of an aerial photograph of the block from 1926/27 and a copy of the 1928 Sanborn Map of this block. The Board finds that the alley in the rear of 2824 thru 2839 N. Howard Street is a 10 foot wide alley as shown on the real property plat for Block 3650C. The Board also notes that the 1928 Sanborn Map also shows that the same alley was a 10 foot wide alley at the time. While this development makes it more difficult to turn into the rear of the properties fronting on N. Howard Street, the Board finds that there has been no change or reduction in the use of the alley.

The Board also determined that Petitioners failed to show that the transformer on the Property violated the rear yard requirements demanded by Section 6–412(e) of the Code.

Petitioners filed a timely petition for judicial review in the Circuit Court, alleging that the Board erred in determining that four unrelated individuals with separate leases constitute a "family," in ruling that the Cresmont Loft project did not

reduce their access to an alley of long public use, and in failing to determine that the transformer violated the Code's rear yard requirements. On 1 March 2007, the Circuit Court ordered consolidation for hearing of the petition challenging the Board's decision on the construction permit and the petition challenging the Board's decision on the occupancy permit.

On 9 May 2007, the Circuit Court affirmed the decisions of the Board. Petitioners timely noted an appeal to the Court of Special Appeals, which, in an unreported decision, affirmed in part and reversed in part. *Armstrong v. Mayor of Balt.*, No. 00883, September Term, 2007, 181 Md.App. 734 (Md. Ct. Spec.App. filed 14 July 2008). The intermediate appellate court upheld the Board's determinations that the Property contained twenty-six "dwelling units" and that the fence erected by Cresmont did not restrict unlawfully Petitioners' access to an alley of public use. The court disregarded Petitioners' argument that the occupancy permit was unlawful because it was issued before construction on the Property was complete, observing that Petitioners did not ask the Board to take any action on that point and did not indicate what relief they sought. The Court of Special Appeals, however, reversed the Board on the issue of whether the transformer violated the Code's rear yard requirements, noting that it was Cresmont's obligation, not Petitioners', "to supply the Board with a plat showing the dimensions of the lot and the location and the dimensions of all the existing and proposed structures and uses thereon." Because Cresmont did not do so, the court could not affirm the Board's decision in favor of Cresmont in that regard. The court also observed that it could not affirm the Board with respect to the transformer, in any event, because the Board failed to address Petitioners' claim that it needed to be enclosed by a screen.

We granted Petitioners' petition for a writ of certiorari to determine whether "the arranged, intended, designed, and actual use of Cresmont [Loft] was and is 26 'dwelling units' for 26 'families' " and to determine whether there was sufficient evidence in the record to justify the Board's conclusion that the fence erected by Cresmont did not impede access to an

alley commonly used by neighborhood residents.[19] *Armstrong v. Baltimore*, 406 Md. 442, 959 A.2d 792 (2008).

## II.

This Court recently reiterated the standard of judicial review applied to the final actions of local zoning agencies:

> When reviewing the decision of a local zoning body, such as the Board, we evaluate directly the agency decision, and, in so doing, we apply the same standards of review as the circuit court and the intermediate appellate court. *People's Counsel for Balt. County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008). "Our function . . . is not to substitute our assessment of the facts for those of the Board . . ., but merely to evaluate whether the evidence before the Board was 'fairly debatable'. . . ." *Pemberton v. Montgomery County*, 275 Md. 363, 367–68, 340 A.2d 240, 243 (1975). Nevertheless, we "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Parcel Serv., Inc. v. People's Counsel for Balt. County*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994) (quoting *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 669, 472 A.2d 62, 69 (1984)).

> The scope of judicial review of administrative fact-finding is a narrow and highly deferential one. *Loyola College*, 406 Md. at 66, 956 A.2d at 173. Accordingly, we will affirm a decision on the facts if it is supported by "substantial evidence." *See id.* at 67, 956 A.2d at 173; *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007); *see also Pemberton*, 275 Md. at 367, 340 A.2d at 243. A conclusion by a local zoning board satisfies the substantial evidence test if "a reasonable mind might accept

---

**19.** Petitioners did not ask this Court to decide whether the issuance of the occupancy permit to Cresmont before construction was finished violated Section 2-404(a) of the Code; nor did the City file a cross-petition asking us to decide whether the transformer violated the Code's rear yard requirements.

as adequate" the evidence supporting it. *Loyola College,* 406 Md. at 67, 956 A.2d at 174 (quoting *Surina,* 400 Md. at 681, 929 A.2d at 910).

Our review of the legal conclusions of a local zoning body, such as the Board, is less deferential, and we "may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute." *Surina,* 400 Md. at 682, 929 A.2d at 910. Nevertheless, "a degree of deference should often be accorded" the legal conclusions of an administrative agency regarding statutes, ordinances, or regulations that the agency is tasked with administering. *Id.* (quoting *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169, 177 (2001)). Thus, in analyzing whether the Board's decision was premised on an erroneous legal conclusion, we should take into consideration the relevant expertise of the Board. *See Loyola College,* 406 Md. at 67, 956 A.2d at 174; *Surina,* 400 Md. at 682–83, 929 A.2d at 911; *see also Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376, 380 (1999).

*Trinity Assembly of God of Balt. City v. People's Counsel for Balt. County,* 407 Md. 53, 77–79, 962 A.2d 404, 418–19 (2008).

 With regard to the "substantial evidence test" that we apply when reviewing the findings of fact of an administrative body, we have reiterated that we do not engage in an "independent analysis of the evidence." *Bereano v. State Ethics Comm'n,* 403 Md. 716, 731, 944 A.2d 538, 547 (2008). An agency decision is " 'prima facie correct and presumed valid.' " *Opert v. Crim. Injuries. Comp. Bd.,* 403 Md. 587, 609, 943 A.2d 1229, 1242 (2008) (quoting *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005)). Accordingly, when applying the substantial evidence test, we construe the evidence in the record in a light most favorable to the agency. *Bereano,* 403 Md. at 731, 944 A.2d at 547.

## III.

The Code's Bulk Regulations operate to place an upper limit on the number of rental units that may be included on a particular property by establishing a minimum allowable square-footage per rental unit. In a B–3–2 Community Commercial District, such as the one in which the Property is located, the minimum lot area is calculated as follows:

(i) 550 square feet per rooming unit.

(ii) 750 square feet per efficiency unit.

(iii) 1,100 square feet per other dwelling unit. [20]

BCZC § 6–411(c)(2).

Thus, reversing the calculation, because the Property is 28,183 square feet in area, it may include, at most, fifty-one rooming units, thirty-seven efficiencies, or twenty-six dwelling units.[21] Relying principally on the fact that all of the leases of Cresmont Loft tenants are "tied to" individual bedrooms, as stated by the property manager, Petitioners claim that the twenty-six suites actually comprise 104 separate and distinct "rooming units," [22] more than double the number allowed by the Bulk Regulations. The City, however, urges that each suite constitutes a "dwelling unit." If the City is correct,

---

**20.** These specifications presently do not apply to hotels or motels with more than twenty rental units or to housing for the elderly. *See* BCZC § 6–411(a)(1), (c)(2).

**21.** The method of computation is provided by Section 6–105(b) of the Code, which states:

(1) The maximum number of permitted dwelling units on a lot is determined by dividing the total area of the lot by the lot area requirement that applies to the subdistrict in which the lot is located. (2) A fraction of the total area that is 50% or more of the required lot area factor counts as an additional permitted dwelling unit.

**22.** As noted earlier, Section 1–186 of the Code provides:

(a) *In general.*
"Rooming unit" means a room or suite of rooms in a house or other building that is rented as living and sleeping quarters, but without cooking facilities.

(b) *Suite of rooms.*
In a suite of rooms, each room that provides sleeping accommodations is counted as 1 rooming unit for purposes of this article.

there are twenty-six dwelling units on the Property, exactly the maximum number allowed by the Bulk Regulations.[23]

The Code defines a "dwelling unit" as "1 or more rooms in a dwelling[ [24]] that: (1) are used as living quarters for occupancy by 1 family; and (2) contain permanently installed bathroom and kitchen facilities reserved for the occupants of the room or rooms." BCZC § 1–137. Thus, for the City to prevail in its assertion that the suites are "dwelling units," the tenants of each suite must meet the Code's land use definition of a "family." The definition of "family," therefore, is the focal point of this case. It provides:

(a) *In general.*

"Family" means one of the following, together with usual household helpers:

(1) an individual;

(2) or more people related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit; or

(3) *a group of not more than 4 people, who need not be related by blood, marriage, or adoption, living together as a single housekeeping unit in a dwelling unit.* [ [25]]

(b) *Roomers included.*

"Family" includes, with respect to those listed in subsection (a)(1) or (2) only, up to 2 roomers within the dwelling unit, as long as:

---

**23.** Neither side contends that any of the rental units in Cresmont Loft are efficiencies.

**24.** A "dwelling" is defined as "a building or part of a building used for residential occupancy." BCZC § 1–136(a). It "does not include an apartment hotel, hotel, rooming house, trailer, or mobile home." *Id.* § 1–136(b).

**25.** The Code uses the word "unit" in two different contexts. For instance, a "dwelling unit" refers to the premises, but a "single house-keeping unit" refers to a group of persons.

 (1) they share a common entrance and cooking and bath-room facilities; and

 (2) in the case of a multiple-family dwelling, no more than 2 roomers are in the entire dwelling, regardless of the number of dwelling units.[26]

(c) *Exclusions.*

In no case, does more than 4 unrelated people, a rooming house, a hotel, or a fraternity or sorority house constitute a family.

BCZC § 1–142 (emphasis added).

The City asseverates that the tenants of each suite may be deemed a "family" under sub-Section (a)(3) of the above definition because, so the City claims, they live together as a "single housekeeping unit." Petitioners insist, however, that each individual Cresmont Loft tenant is a family under sub-Section (a)(1). According to Petitioners, the terms of the tenants' leases prevent them from "living together as a single housekeeping unit" because they each have a separate lease agreement with Cresmont and Cresmont reserves the right, pursuant to the leases, to move any tenant to another suite in the Property or into another bedroom within the suite in which she or he currently resides.

The Code does not define the phrase "single housekeeping unit"; however, it is the pivotal term in our assessment of whether the Board concluded properly that the tenants of a suite at Cresmont Loft constitute a "family," and, in turn, that each suite is a "dwelling unit" for purposes of the Code's Bulk Regulations. The parties agree that the City adopted the term "single housekeeping unit" as part of the Code definition of "family" in 1971 in the course of creating a more compre-hensive zoning scheme for Baltimore City.[27] Neither side in

---

**26.** "Roomer" is defined as "an individual who: (1) occupies a room with a family in a dwelling unit; or (2) occupies a rooming unit for compensation." BCZC § 1–184.

**27.** A comprehensive zoning scheme was enacted in 1971 by Ordinance No. 1051

this case suggested that there was any relevant legislative history that might illuminate what the City intended the term to mean. Our considerable independent research in that regard also was unavailing. Nevertheless, the phrase "single housekeeping unit" is found with some frequency in the zoning codes of other municipalities and local governments across the country, and the attendant judicial opinions interpreting those codes help us to triangulate on a common and ordinary sense of the phrase as used in comparable land use settings.

 When interpreting a statute or ordinance, courts presume that the enacting legislative body uses " 'familiar legal expressions in their familiar legal sense,' " unless the legislature indicates a contrary intent. *Trinity Assembly of God,* 407 Md. at 92, 962 A.2d at 427 (quoting *United States v. Dodson,* 291 F.3d 268, 271 (4th Cir.2002)). Although there is no reported Maryland appellate opinion defining or applying the term "single housekeeping unit," the phrase has been part of the national land-use dialogue for a considerable time. According to the Supreme Court of Pennsylvania, "[t]he use of the 'single housekeeping unit' formulation flowed from its use

---

to lessen congestion in the streets; to secure safety from fire, panic, and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewage, schools, parks, and other public requirements; to conserve the value of buildings and other structures; to encourage the most appropriate use of land throughout the City; and to divide the City into zoning districts of such character, number, shape, and area as are best suited to effect the foregoing purposes.

An earlier definition of "family," adopted in 1953, defined the term as "[a] person living alone, or two or more persons living together as a housekeeping unit, with separate identity from other persons or groups in the same structure, having cooking facilities as a part of the area designated for his or their use." *See Aaron v. Mayor of Balt.,* 207 Md. 401, 407, 114 A.2d 639, 641 (1955). Until then, the term "family" was not defined by the Code. *See id.* (holding that, where property owner sought to prove that four families lived in the building prior to 1931 for purposes of establishing the building's non-conforming use as a four-family dwelling, boarders did not constitute separate "families" because they did not have their own "housekeeping facilities," even though "family" was not defined expressly until 1953).

by leading commentators on zoning." *In re Appeal of Miller*, 511 Pa. 631, 515 A.2d 904, 907 n. 3 (1986) (citing EDWARD M. BASSETT, ZONING 189 (1940 ed.)). The court offered the following epistemological lesson on the term's history:

> Alfred Bettman in a law review article written in 1924 stated the proposition that "promotion of the single family home ... is deemed good public policy in America." Bettman, *Constitutionality of Zoning*, 37 Harv. L.Rev. 834, 839–40 (1924). From that point "zoning spread swiftly, particularly in suburban communities." J.R. Richards, *Zoning For Direct Social Control*, 5 Duke Law Journal 761, 767 (1982). At an early stage of that development the legitimacy of exclusive single-family districts was settled. However, the question that emerged was how, if at all, a given ordinance should define the term "family." Initially, a significant number of ordinances resolved that issue by leaving the word undefined. *See, e.g.*, Baltimore, Md., Code art. 49 § 1 (1928); Birmingham, Ala., General Code Ordinance 1101–C, art. I, § 1 (1930). The consequence of that approach was to leave the resolution of the term "single family" to the courts. *See, e.g., Brady v. Superior Court*, 200 Cal.App.2d 69, 77–82, 19 Cal.Rptr. 242, 247–49 (1962); *Region 10 Client Management, Inc. v. Town of Hampstead*, 120 N.H. 885, 887, 424 A.2d 207, 208–09 (1980); *Carroll v. Washington Township Zoning Comm'n*, 63 Ohio St.2d 249, 251, 408 N.E.2d 191, 193 (1980). The weakness of that strategy was the uncertainty it created and also the attendant cost of litigation.
>
> As the dissatisfaction with reliance solely upon judicial interpretation for the definition of the term "family" became increasingly apparent, the drafters of those ordinances attempted to legislatively set forth a more precise meaning within the ordinances. One of the early formulations used to define "family" within the terms of those provisions was that of a "single housekeeping unit." *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The ordinance in effect, in the instant Township prior to the 1978 amendment, used the "housekeeping unit"

formulation. Regrettably, this attempt to define "family" did not supply the degree of clarity it was intended to provide. A review of the cases throughout the country indicates that the change served only to focus the litigation upon a determination as to the meaning of a "housekeeping unit." In those cases interpreting zoning ordinances wherein the "family" limitation had been defined as a "single housekeeping unit," many extended family groups were deemed to fall within that category. The use of this test was viewed as extending beyond the occupancy by a one-family unit to a determination as to whether it was a one-housekeeping unit. *See Neptune Park Ass'n v. Steinberg*, 138 Conn. 357, 84 A.2d 687 (1951). The focus was on whether the unit functioned as a family unit, rather than on the respective relationships that existed between the members of the unit. *See, e.g., City of Syracuse v. Snow*, 123 Misc. 568, 205 N.Y.S. 785 (Sup.Ct.1924) ("single housekeeping unit" held not to exclude a college sorority); *Robertson v. Western Baptist Hospital*, 267 S.W.2d 395 (Ct. of Appeals of Ky.1954) (use of a residence as a home for about 20 nurses constituted a permitted use under a "single housekeeping unit" test); *Boston–Edison Protective Ass'n v. Paulist Fathers*, 306 Mich. 253, 10 N.W.2d 847 (1943), 306 Mich. 253, 10 N.W.2d 847, 148 A.L.R. 364 (approved the use of a dwelling house in a highly restricted district as a residence for Roman Catholic priests).

*Miller*, 515 A.2d at 907.

As noted in Rathkopf's treatise on zoning, "[i]n the past, courts have interpreted [the phrase 'single housekeeping unit'] in a rather elastic way, generally ruling that any living arrangement which makes use of unified house-keeping facilities satisfies such an ordinance." 3 EDWARD H. ZIEGLER, JR. ET AL., RATHKOPF'S THE LAW OF ZONING AND PLANNING 23–33 (Thompson Reuters 2009). A survey of relevant case law from other jurisdictions confirms this.

In *Miller, supra*, the Pennsylvania Supreme Court held that a homeowner, who allowed unrelated elderly and handicapped persons to live with her, did not violate a local ordinance

limiting the occupation of a home in her zoning district to one "family," where "family" was defined by the ordinance as "any number of persons living and cooking together as a single house-keeping unit."[28] 515 A.2d at 909. That court opined, based on the extensive history of the term, that "the 'single housekeeping unit' evolved as a term limiting the use [of a property] to a unit that functions in the manner of a family residence." *Id.* at 908. The court reasoned that the unrelated individuals living with the homeowner constituted a single housekeeping unit because the evidence established that they lived and cooked together, shared meals together, and had shared access to all areas of the premises. *Id.* Similarly in *Robertson v. W. Baptist Hosp.*, 267 S.W.2d 395 (Ky.1954), the Court of Appeals of Kentucky[29] held that a group of twenty nurses, who rented a large house near the hospital where they worked, constituted a "single housekeeping unit." In so doing, that court emphasized that the nurses had joint use of the home's parlor and "limited kitchen facilities," although each nurse was responsible for furnishing her own food. *Robertson*, 267 S.W.2d at 396. In another case, *Linn County v. City of Hiawatha*, 311 N.W.2d 95 (Iowa 1981), the Supreme Court of Iowa held that a foster home in which a married couple cared for six unrelated, developmentally-disabled children constituted a "single housekeeping unit." There, the court rejected the argument that, because the children's Social Security benefits covered the cost of maintaining them in the home, the setting was akin to a boarding house. *Linn County*, 311 N.W.2d at 100. The court reasoned that, in effect, " 'the duties and responsibilities of the occupants [of the foster home] in . . . maintaining a household . . . cannot be distin-

---

**28.** BCZC § 1–142(a)(3) does not require expressly that tenants of a dwelling unit cook and/or eat together to qualify as a "single housekeeping" unit.

**29.** Until 1976, the Court of Appeals of Kentucky was the state's highest court. *See* KY REV STAT ANN § 21A.100 (LexisNexis 2009) ("The records of the Court of Appeals involving proceedings before that court, prior to January 1, 1976, shall become part of the permanent records of the Supreme Court. Such records shall be given the same faith and credit as are records of the Supreme Court.").

guished from those performed by other home dwellers in the community.' " *Id.* (ellipses in original) (quoting *Twp. of Wash. v. Cent. Bergen Cmty. Mental Health Ctr., Inc.*, 156 N.J.Super. 388, 383 A.2d 1194, 1209 (Law Div.1978)).

In *Borough of Glassboro v. Vallorosi*, 117 N.J. 421, 568 A.2d 888 (1990), the Supreme Court of New Jersey affirmed a trial court's finding that ten unrelated college students were a "single housekeeping unit." [30] There, the parents of a college student purchased a house near campus in which they allowed their son and nine of his friends to live while attending school. *Vallorosi*, 568 A.2d at 890. The student roommates shared the common areas of the house, as well as a telephone line; they "often ate meals together in small groups, cooked for each other, and generally shared the household chores, grocery shopping, and yard work." *Id.* Like the tenants of Cresmont Loft, the roommates in *Vallorosi* had separate lease agreements with the landlord. *See id.* Each lease was for a term of four months (the length of a semester) and was renewable at the term's end. *Id.*

The *Vallorosi* court framed the "narrow issue before [it]" as "whether there [wa]s sufficient credible evidence in th[e] record to sustain the trial court's factual finding that the occupancy of the defendants' dwelling by these ten college students constituted a single house-keeping unit as defined by the Glassboro ordinance." *Id.* at 894. Answering in the affirmative, the court highlighted that

---

**30.** The ordinance at issue in *Vallorosi* defined "family" as

> one or more persons occupying a dwelling unit as a single non-profit housekeeping unit, who are living together as a stable and permanent living unit, being a traditional family unit or the functional equivalency [sic] thereof.

568 A.2d at 889 (alteration in original) (quoting Glassboro, N.J., Code § 107–3 (1986)). That definition does not diminish *Vallorosi* 's persuasive value to the instant case. If anything, Glassboro's definition of "family" is less permissive than BCZC § 1–142(a) with regard to what types of living arrangements may qualify as a "single housekeeping unit"; however, it does not place an upper limit on the number of unrelated individuals that may qualify as a "single housekeeping unit" in the way that BCZC § 1–142(a)(3) does.

The students ate together, shared household chores, and paid expenses from a common fund. Although the students signed four-month leases, the leases were renewable if the house was "in order" at the end of the term. Moreover, the students testified to their own intention to remain in the house throughout college, and there was no significant evidence of defections up to the time of trial.

*Id.* at 894.

■ The "narrow issue" before this Court is whether the Board's decisions affirming the issuance of the April 2004 construction permit and the August 2004 occupancy permit were supported by substantial evidence. Viewing the evidence of record in a light most favorable to the Board, we hold that they were. The Cresmont Loft form lease agreement provides that a tenant has the sole use of her or his bedroom and the "shared use and occupancy of the bathroom(s), kitchen and living/dining areas" of the apartment in which she or he resides. It further establishes that the tenant is "liable for a pro-rata share of any damages to the common areas of the apartment unit ... unless the party solely responsible for any such damage can be reasonably ascertained." Moreover, according to the undisputed testimony of the property manager, Brian Swift, Cresmont Loft leases are for a term of one year. Mr. Swift also echoed that a tenant has "the exclusive right to th[e] entire four bedroom unit" and that she or he is equally "responsible for the care and maintenance of the apartment unit." As observed in the cases discussed herein, shared access to the premises and joint responsibility for the care thereof are significant considerations. *See Robertson,* 267 S.W.2d at 396; *Vallorosi,* 568 A.2d at 890; *Miller,* 515 A.2d at 908.

Cresmont received a construction permit for a twenty-six unit apartment building and, ultimately, an occupancy permit authorizing the Property's use for twenty-six "dwelling units." In determining that the permits were issued properly, the Board observed, in its decision on the occupancy permit, "even though the four occupants of [a Cresmont Loft apartment]

have separate lease agreements with the lessor, such arrangement does not alter the fact that they are living together as a single housekeeping unit where the testimony established that they would be sharing normal household responsibilities such as cooking, cleaning and other related household duties." It made essentially the same finding in its final decision on the construction permit. Thus, the Board reasoned that the tenants of each suite constitute a "family" under BCZC § 1–142(a)(3), rendering each suite in the Property a "dwelling unit." The Board's rationale and assessment of the evidence were reasonable, and, accordingly, we shall not disturb its conclusion. *See Trinity Assembly of God,* 407 Md. at 78, 962 A.2d at 419 (observing that the fact-finding of a zoning body will not be reversed if it was reasonable); *Bereano,* 403 Md. at 731, 944 A.2d at 547 (noting that, when reviewing an administrative decision, courts do not engage in an "independent analysis of the evidence").

Petitioners' flagship argument in opposition to the Board's conclusion lies in the Cresmont Loft lease agreement. Petitioners maintain that the tenants of a suite may not be a "single housekeeping unit" because each has a separate lease agreement "tied to" an individual bedroom, and, under those agreements, Cresmont reserves the right to move any of them to another suite at any time. We are not persuaded that these considerations compel a different conclusion than that reached by the Board. In *Vallorosi,* the ten college students residing together had separate lease agreements with their landlord. 568 A.2d at 890.

In addition, the fact that the Cresmont Loft leases are "tied to" individual bedrooms, with Cresmont reserving the right to move a tenant to another suite, is not inconsistent with the rights and obligations of the tenants *with respect to one another* (namely the right to shared use of the common areas of the apartment and the joint obligation to maintain the apartment). Petitioners do not offer any reason for concluding that four unrelated individuals whose leases are "tied to" individual bedrooms are in a living arrangement that, for purposes of the "single housekeeping unit" analysis, differs

materially from an arrangement in which four unrelated individuals, in similar circumstances, collectively sign a lease for a four-bedroom apartment. *Cf. Linn County,* 311 N.W.2d at 100 (holding that married couple and six unrelated foster children were a "single housekeeping unit" because their duties and responsibilities in the home were indistinguishable from those of other homeowners in the community). Furthermore, by signing a Cresmont Loft lease agreement, a tenant ordinarily may expect to share an apartment with the same three suitemates for the one-year duration of the lease. The mere possibility that one (or more) of the suitemates may be removed from the housekeeping unit in less than one year's time does not undermine the unit's stability or permanence to such a degree as to warrant reversal of the Board's decision.[31] *Cf. Vallorosi,* 568 A.2d at 894 (affirming lower court's determination that 10 college students living together constituted a "single housekeeping unit," despite the fact that each student's

---

**31.** We reiterate that the narrow scope of judicial review of administrative fact-finding guides our holding here. The fact that a tenant may be removed by the landlord from the purported housekeeping unit certainly weighs against a determination that the group of tenants comprises a "single housekeeping unit." *See Commonwealth v. Jaffe,* 398 Mass. 50, 494 N.E.2d 1342, 1344, 1347 (1986) (affirming criminal conviction for violation of an ordinance that precluded the use of a dwelling for more than one family; assuming the "single housekeeping unit" standard applied, the conviction was supported by the facts that each of the eight tenants had her or his own mailbox and was subject to eviction at any time upon thirty days' notice without the eviction affecting the tenancies of the other tenants). Yet, as we emphasized on a previous occasion, "[i]n judicial review of zoning matters, . . . 'the correct test to be applied is whether the issue before the administrative body is 'fairly debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions.'" *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079 (1999) (quoting *Sembly v. County Bd. of Appeals,* 269 Md. 177, 182, 304 A.2d 814, 818 (1973)). Additionally, there was no evidence before the Board (that we can discern from the record) suggesting that Cresmont exercised its rights to shuffle tenants. Evidence of frequent changes to the makeup of a group sharing an apartment might compel a different outcome than that reached by the Board. *See Planning & Zoning Comm'n v. Synanon Found., Inc.,* 153 Conn. 305, 216 A.2d 442, 443 (1966) (holding that "an ever-changing aggregate of individuals" did not constitute a "family").

lease was for a term of four months, in part, because the students intended to renew their leases and continue living together).

Petitioners next posit that allowing the Board's decisions to stand leads to an absurd result in light of sub-Section (b) of the Code's definition of "family," which extends the definition of "family" to include a group made up of an individual occupying a dwelling unit and not more than two "roomers," [32] as long as the roomers "share a common entrance and cooking and bathroom facilities" with the individual. BCZC § 1–142(b)(1). According to Petitioners, sub-Section (b) prohibits an individual from having more than two roomers. They argue, therefore, as follows:

> [I]f an individual occupant shares a common entrance, kitchen and bathroom facilities with one or two 'roomers,' the resultant group of two or three unrelated residents is considered a 'family' occupying a 'dwelling unit' under § 1–142(b)(1). The allowable number of 'roomers' ... is expressly limited to two; if the individual occupant should add a third 'roomer,' the resultant group of four unrelated residents is *not* a 'family' occupying a 'dwelling unit' under the plain language of § 1–142(b)(1).

The unambiguous limit of two 'roomers' per 'dwelling unit' under § 1–142(b)(1) *loses all meaning and effect* if § 1–142(a)(3) allows four unrelated individuals sharing a common entrance, kitchen and bathroom facilities to be considered a 'family' occupying a 'dwelling unit' *regardless of leasing arrangements*. It then becomes difficult to discern any purpose whatsoever for the application of the 'roomers' provision [in § 1–142(b)(1) ], since an individual with one or two roomers would already qualify as a 'family' of two or three unrelated individuals under the Board's interpretation of § 1–142(a)(3). Certainly, under the Board's broad read-

---

**32.** As previously noted, a "roomer" is "an individual who: (1) occupies a room with a family in a dwelling unit; or (2) occupies a rooming unit for compensation." BCZC § 1–184. Here, we are dealing with the former.

ing, an individual sharing a common entrance, kitchen and bathroom facilities with one, two or even three 'roomers' would *always* be a 'family' of not more than four unrelated residents occupying a 'dwelling unit.'

(italics in original).

Stated more plainly, Petitioners assert that the Board's notion of a "single housekeeping unit" under sub-Section (a)(3) so dilutes the statutory scheme that it renders nugatory sub-Section (b)'s provision allowing an individual occupying a dwelling unit to have up to two roomers. This argument is not persuasive. The fatal defect in Petitioners' reasoning is that it assumes that an individual with "roomers," qualifying as a "family" under Section 1–142(b), necessarily would satisfy also the "single housekeeping unit" standard of Section 1–142(a)(3), as applied by the Board. While the Board's decisions here cut a broad swath, they do not go so far as to negate the "roomers" provision in sub-Section (b) as Petitioners claim. Indeed, the "roomers" provision requires only that an individual occupant of a dwelling unit and her or his roomers "share a common entrance and cooking and bathroom facilities" in order for them to qualify as a "family" under sub-Section (b). The evidence before the Board, however, established that each tenant of a Cresmont Loft apartment enjoyed shared use of the entire apartment (with the exception of the other bedrooms) and was jointly responsible for its maintenance and care.

■ In addition, the "single housekeeping unit" standard ordinarily does not embrace circumstances in which one or more of the members of the purported unit are transient. *See Open Door Alcoholism Program, Inc. v. Bd. of Adjustment,* 200 N.J.Super. 191, 491 A.2d 17, 19, 22 (App.Div.1985) (holding that eleven people staying in a group home for alcoholics did not qualify as a "family" under the "single housekeeping unit" standard because they "could leave at any time" and the average length of stay was only six months); *cf. Planning and Zoning Comm'n v. Synanon Found., Inc.,* 153 Conn. 305, 216 A.2d 442, 443 (1966) (applying a zoning ordinance that did

not define the term "family" and holding that "an ever-changing aggregate of individuals" did not constitute a "family"). The Board's decisions do not deviate from that general proposition, as the testimony of the property manager established that each of Cresmont Loft's tenants signs a one-year lease. The "roomers" provision of Section 1–142(b), however, facially allows for an individual occupant of a dwelling unit to rent space to transient roomers, as it places no limitations on such arrangements. Thus, certain arrangements between an individual occupying a dwelling unit and one or more roomers, which may qualify them as a "family" under sub-Section (b), might not be sufficient to qualify them as a "single housekeeping unit." [33] Furthermore, the arrangements that sub-Section (b) allows need not be mutually exclusive with what sub-Section (a) allows. Therefore, the presence of one or more tenants in a dwelling unit who meet the definition of a "roomer" does not mean necessarily that the entire group might not qualify also as a "family" under sub-Section (a)(3) by otherwise living together as a "single housekeeping unit." Thus, Section 1–142(a)(3) as applied by the Board does not render sub-Section (b) nugatory.

Petitioners also direct our attention to *Prospect Gardens Convalescent Home, Inc. v. City of Norwalk*, 32 Conn.Supp. 214, 347 A.2d 637 (1975), as support for the proposition that the tenants of a Cresmont Loft apartment are not a "single housekeeping unit." In that case, the owner of a convalescent home leased three houses near the convalescent home to as many as thirty of its employees. After the local health department notified the owner that the employee housing facilities constituted rooming houses, the owner filed suit against the city seeking declaratory and injunctive relief. The owner alleged that the employee-occupants of the houses were "families" under an ordinance defining the term as "any number of individuals living and cooking together as a single

---

**33.** Transiency is not the only factor that might prohibit a tenant from being part of a "single housekeeping unit." We discuss transiency only as an example to explain that not all roomers (who may, or may not, be transient) would qualify as part of a "single housekeeping unit."

housekeeping unit." *Prospect Gardens*, 347 A.2d at 639. The Superior Court rejected the owner's argument, reasoning that the employee-occupants were not families because they each paid rent individually to their employer, there was no showing that they cooked and/or ate together, and they rarely were together as a group due to the fact that they worked different shifts at the convalescent home. *Id.* at 640.

We reject Petitioners' favored comparison of *Prospect Gardens* to the present case. In *Prospect Gardens*, the three houses at issue housed, respectively, seven, ten, and eleven employees. *Id.* at 639. Because controlling population density is one of the objectives of limiting what constitutes a "family," the court observed that the high number of people comprising each purported housekeeping unit mitigated against finding that they constitute a family. *Id.* at 641. In the instant case, however, there are only four tenants comprising the "single housekeeping unit." It is not apparent whether the *Prospect Gardens* court would have resolved that case in the same way if the houses at issue housed only four employees each. Moreover, to the extent that *Prospect Gardens* is inconsistent with the Board's decisions here, we note that the *Prospect Gardens* decision is that of a trial court, albeit of a respected sister state's judiciary. Other opinions by state supreme courts persuade us that we should not hold that the Board here improperly construed or applied the term "single housekeeping unit." *See Robertson*, 267 S.W.2d at 397 (affirming trial court's decision that twenty nurses sharing a house constituted a "single housekeeping unit" because they had joint use of a parlor and kitchen facilities); *Vallorosi*, 568 A.2d at 894 (affirming trial court's decision that ten unrelated college students sharing a house constituted a "single housekeeping unit," despite fact that they each had a separate lease with their landlord).

## IV.

Petitioners next claim that Cresmont's erection of a fence impedes their access to an alley of long common use and that the Board's conclusion otherwise was not supported by sub-

stantial evidence. The "alley" in question is located on what is now the Property. According to Petitioner Joan Floyd, who testified at the hearing on the negative appeal of the construction permit, it is a twenty-foot-wide right-of-way.[34] She stated that she lives on North Howard Street and has used the right-of-way to access her garage since moving into her house in 1996. She claimed essentially that her garage is obsolete now because the fence erected by Cresmont precludes her from using the right-of-way. She averred also that other public and private users, such as the Fire Department and Baltimore Gas and Electric, occasionally used the right-of-way and that police even ticketed cars that parked there. Additionally, Petitioners produced aerial photographs and a 1928 map of the neighborhood reflecting the presence of the right-of-way. The map also showed that there is a ten-foot-wide alley behind Ms. Floyd's house. That alley was accessible previously by the right-of-way at issue. Ms. Floyd's garage abuts the ten-foot-wide alley.

In its decision on Petitioners' appeal of the construction permit, the Board found, with respect to the issue of the right-of-way:

> [T]he Negative Appellants raised concerns about two separate alleys. The previous use of 2807–35 Cresmont [the Property] was several groups of one story garages that contained a variety of uses and tenants. There was a 20 foot wide by 119 foot alley that served these garages. This alley did not serve as a secondary means of vehicular access to the properties fronting on Howard Street or W. 29th Street [the houses owned by Petitioner Floyd and others].
>
> The garages were razed several years ago and the lot became unimproved. The alley was closed per Ordinance No. 03–548 and the area was consolidated into the 2807–25 Cresmont Avenue Lot.

---

**34.** For the sake of clarity, a right-of-way is a "strip of land subject to a non-owner's right to pass through." BLACK'S LAW DICTIONARY 1351 (8th ed. 2004).

The other alley in question is the alley in the rear of the properties fronting on the 2800 block of N. Howard Street. Ms. Joan Floyd testified that the development plan constricts, reduces and obstructs public use of the rear alley in this block. Ms. Floyd submitted photographs of the alley prior to the demolition of the garages; a copy of an aerial photograph of the block from 1926/27 and the 1928 Sanborn Map of this block.

The Board finds that the alley in the rear of 2824 thru 2830 N. Howard Street is a 10 foot wide alley as shown on the real property plat for Block 3650C. The Board also notes that the 1928 Sanborn Map also shows a that the same alley was a 10 foot wide alley at that time. While this development makes it more difficult to turn into the rear of the properties fronting on N. Howard Street, the Board finds that there has been no change in the use of the alley.

█ The Board's conclusion on the alley/right-of-way issue was supported by substantial evidence. The Code defines an "alley" as "a way, other than a street, that: (1) is open to common use; and (2) affords a secondary means of vehicular access to adjacent or adjoining property." BCZC § 1–108. The unrefuted evidence adduced by Petitioners suggests that the twenty-foot-wide right-of-way, at some time, satisfied the definition of an "alley"; however, even if that were so, the City, as noted by the Board, enacted an ordinance closing the right-of-way. Petitioners do not allege that the Board was mistaken on that point; nor do they allege, at least in this case, that the ordinance was invalid. Additionally, the evidence adduced by Petitioners shows that the alley abutting Ms. Floyd's garage has been ten feet wide since the 1920s. They did not present any evidence suggesting that that alley was reduced in size by Cresmont's development of the Property. Accordingly, the Board's determination—that Cresmont did not restrict an alley of public use by erecting a fence on the Property—is " 'sustainable on the agency's findings and for the reasons stated by the agency.' " *Trinity Assembly of*

*God,* 407 Md. at 77–78, 962 A.2d at 418 (quoting *United Parcel Serv., Inc.,* 336 Md. at 577, 650 A.2d at 230).[35]

## V.

For the reasons discussed, we affirm the judgment of the Court of Special Appeals. Substantial evidence supported the Board's conclusion that the tenants residing in a Cresmont Loft apartment constitute a "single housekeeping unit," and, therefore, a "family" as defined by the Code. Thus, each apartment in the Property is a "dwelling unit" and the Board properly affirmed DHCD's issuance of a construction permit and, ultimately, an occupancy permit to Cresmont for development and use of the Property. In addition, substantial evidence supported the Board's determination that a fence erected on the Property did not restrict Petitioners' access to an alley of common use.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**

---

**35.** Petitioners also argue that the intermediate appellate court upheld the Board for reasons not relied upon by the Board. We need not address that contention because, when reviewing an agency decision ordinarily, "we look 'through the circuit court's and the intermediate appellate court's decisions,'" evaluating directly the agency decision. *Loyola College,* 406 Md. at 66, 956 A.2d at 174 (quoting *Surina,* 400 Md. at 681, 929 A.2d at 910).