515 A.2d 904

**In re Appeal of Irene C. MILLER from the Middletown Township Zoning Board of Adjustment.**

**Irene C. Miller, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1985.

Decided Oct. 3, 1986.

Colin M. Jenei, Wayne N. Cordes, Newtown, for appellant.

Martha F. Lindner, Bernard D. Cullen, Langhorne, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This is an appeal from an order of the Commonwealth Court, 85 Pa.Cmwlth. 407, 482 A.2d 688, affirming a decision by the Court of Common Pleas of Bucks County which sustained the Zoning Board of Adjustment's direction to appellant, Irene C. Miller, to cease and desist her current use of her property. Appellant argues, *inter alia*, that the use was a lawful, nonconforming one.

The property here involved is a detached, single-family dwelling located in a district of Middletown Township ("Township"), Bucks County, that is zoned "R–2." Like most single-family homes, Mrs. Miller's house has one kitchen; however, the structure is large enough to include six bedrooms, two bathrooms and a finished recreation room. Pursuant to the Township's zoning ordinance, a detached single-family dwelling is a permitted use in an "R–2" district; but convalescent homes, nursing homes and boarding houses are not. (See Board of Adjustment's findings Nos. 24 and 25, Reproduced Record page 183a).

Beginning in October of 1974, Mrs. Miller started receiving into her house as boarders various aged or physically handicapped or mentally retarded persons who had been referred to her by certain hospitals or social agencies.

Between 1974 and 1978, the number of such boarders ranged from a minimum of one to a maximum of seven. After having accepted her first paying "guest" in October, 1974, Mrs. Miller increased the number to two by the end of that year. In 1976 the number rose to four; and from 1977 onward there were seven. In return for a fee of approximately $200.00 a month per individual, Mrs. Miller provided them with room, board, some transportation, supervision in grooming, and monitoring of personal needs. The Miller house, in addition to accommodating the several paying residents, was the residence of Mrs. Miller and her foster daughter. Another resident of the home was a Mrs. Hart, who, in return for bed and board, assisted in the care of the paying residents. With the exception of Mrs. Miller and her foster daughter, none of the people living in the house were related.

When Miller commenced this use of her property in 1974, the zoning ordinance in effect was one that had been enacted by the Township in 1948. Under that ordinance, the term "family" was defined as *any number of persons living and cooking together as a single housekeeping unit."* (Emphasis added.) Subsequently, on June 27, 1978, that definition was amended to read:

> FAMILY. a family is: [1] one or more persons *related by blood, adoption or marriage* living and cooking together as a single housekeeping unit; and (2) *not more than two persons* living and cooking together who are not related-by-blood, adoption or marriage. (Emphasis added.)

On June 10, 1980, the Assistant Township Zoning Officer, purporting to act on the protests of neighbors, notified Mrs. Miller that her having more than one unrelated person in her house violated the zoning ordinance, and ordered her to cease and desist from such use of the property. Miller responded by filing an appeal to the Township's Zoning Board of Adjustment ("Board").

In her appeal to the Board, the property owner asserted that the residents of her house are a "family" within the definition of that term in the pre–1978 ordinance, and that,

consequently, the premises are being used as a single-family dwelling within the meaning of that ordinance. In short, she contended that the use was a lawful, nonconforming use.[1] Mrs. Miller also argued that the 1978 zoning ordinance is unconstitutional because, according to her, the ordinance made no provision for boarding homes in residential areas. Additionally, she asserted that she was entitled to a use variance.

The Board rejected all of the appellant's arguments, and entered a decision upholding the cease and desist order. With regard to the issue of lawful nonconforming use, the Board determined that the residents of the Miller household did not constitute a "family" even within the definition of the 1948 ordinance, because eight of them either paid money or rendered services for their lodging, board and care, and because the membership of the group was subject to periodic change. Mrs. Miller followed with an appeal to the Court of Common Pleas of Bucks County, renewing her claim of a nonconforming use and the constitutional challenge she had made before the Board.[2] Without taking additional evidence, the Court of Common Pleas affirmed the Board's decision. Upon a further appeal to the Commonwealth Court, the order of the trial court was affirmed. Mrs. Miller petitioned our Court for review, which we granted.

1. Section 107(13.1) of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10107(13.1), defines a "nonconforming use" as:

 a use, whether of land or of structure, which does not comply with the applicable use provisions in a zoning ordinance or amendment heretofore or hereafter enacted, *where such use was lawfully in existence prior to the enactment of such ordinance or amendment,* or prior to the application of such ordinance or amendment to its location by reason of annexation. (Emphasis added.)

2. She also presented two arguments which had not been raised before the Board: (a) that the Township's delay in enforcing the 1978 ordinance against her use of the property as a personal care boarding home gave her a vested right to continue such use; and (b) that the 1978 ordinance was being applied to her property in a manner which was discriminatory.

Where, in a zoning case, the trial court has not taken additional evidence, our scope of review is limited to determining whether or not the zoning hearing board committed an error of law or a manifest abuse of discretion. *Pyzdrowski v. Board of Adjustment of City of Pittsburgh*, 437 Pa. 481, 263 A.2d 426 (1970); *Stratford Arms, Inc. v. Zoning Board of Adjustment*, 429 Pa. 132, 239 A.2d 325 (1968); *Gross v. Zoning Board of Adjustment of City of Philadelphia*, 424 Pa. 603, 227 A.2d 824 (1967); *Brennen v. Zoning Board of Adjustment of the City of Connellsville*, 409 Pa. 376, 187 A.2d 180 (1963). For the reasons that follow, we are satisfied that appellant is correct in her assertion that the use was permitted under the 1948 ordinance. In view of our disposition, the remaining arguments raised need not be addressed.

Our resolution of this issue focuses upon the definition of the term "family" as used in the 1948 ordinance. The drafters of that ordinance defined that term as "any number of persons living and cooking together as a single housekeeping unit." For purposes of the instant dispute the meaning of the term "housekeeping unit" as used in that definition must be determined.

To fully appreciate the issue raised, some background in this area is helpful. Alfred Bettman in a law review article written in 1924 stated the proposition that "promotion of the single family home ... is deemed good public policy in America." Bettman, *Constitutionality of Zoning*, 37 Harv.L.Rev. 834, 839–40 (1924). From that point "zoning spread swiftly, particularly in suburban communities." J.R. Richards, *Zoning For Direct Social Control*, 5 Duke Law Journal 761, 767 (1982). At an early stage of that development the legitimacy of exclusive single-family districts was settled. However, the question that emerged was how, if at all, a given ordinance should define the term "family." Initially, a significant number of ordinances resolved that issue by leaving the word undefined. *See, e.g.,* Baltimore, Md., Code art. 49, § 1 (1928); Birmingham, Ala., General Code Ordinance 1101–C, art. I, § 1 (1930). The consequence

of that approach was to leave the resolution of the meaning of the term "single family" to the courts. *See, e.g., Brady v. Superior Court,* 200 Cal.App.2d 69, 77–82, 19 Cal.Rptr. 242, 247–49 (1962); *Region 10 Client Management, Inc. v. Town of Hampstead,* 120 N.H. 885, 887, 424 A.2d 207, 208–09 (1980); *Carroll v. Washington Township Zoning Comm'n,* 63 Ohio St.2d 249, 251, 408 N.E.2d 191, 193 (1980). The weakness of that strategy was the uncertainty it created and also the attendant cost of the litigation.

As the dissatisfaction with reliance solely upon judicial interpretation for the definition of the term "family" became increasingly apparent, the drafters of those ordinances attempted to legislatively set forth a more precise meaning within the ordinances. One of the early formulations used to define "family" within the terms of those provisions was that of a "single housekeeping unit." [3] *See, e.g., Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The ordinance in effect, in the instant Township prior to the 1978 amendment, used the "housekeeping unit" formulation. Regrettably, this attempt to define "family" did not supply the degree of clarity it was intended to provide. A review of the cases throughout the country indicates that the change served only to focus the litigation upon a determination as to the meaning of a "housekeeping unit." In those cases interpreting zoning ordinances wherein the "family" limitation had been defined as a "single housekeeping unit," many extended family groups were deemed to fall within that category. The use of this test was viewed as extending beyond the occupancy by a one-family unit to a determination as to whether it was a one-housekeeping unit. *See Neptune Park Ass'n v. Steinberg,* 138 Conn. 357, 84 A.2d 687 (1951). The focus was on whether the unit functioned as a family unit, rather than on the respective relationships that existed between the members of the unit. *See, e.g., City of Syracuse v. Snow,* 123 Misc. 568, 205 N.Y.S. 785

---

**3.** The use of the "single housekeeping unit" formulation flowed from its use by leading commentators on zoning. *See, e.g.,* E. Bassett, *Zoning* (1940 ed.) at 189.

(Sup.Ct.1924) ("single housekeeping unit" held not to exclude a college sorority); *Robertson v. Western Baptist Hospital*, 267 S.W.2d 395 (Ct. of Appeals of Ky.1954) (use of a residence as a home for about 20 nurses constituted a permitted use under a "single housekeeping unit" test); *Boston-Edison Protective Ass'n v. Paulist Fathers*, 306 Mich. 253, 10 N.W.2d 847 (1943), 148 A.L.R. 364 (approved the use of a dwelling house in a highly restricted district as a residence for Roman Catholic priests).

From these cases it is evident that the "single housekeeping unit" formulation was not generally construed as limiting the use to a group of persons related by blood or marriage. Nor did the fact that some fee is charged necessarily remove the unit from this classification. *See, e.g., Costley v. Caromin House, Inc.*, 313 N.W.2d 21 (Minn. 1981).

A review of decisions within this Commonwealth shows them to be in conformity with this pattern. In *Children's Aid Society v. Zoning Board of Adjustment*, 44 Pa. Commw.Ct. 123, 402 A.2d 1162 (1979), the society sought to use a detached dwelling as a residence for a family with six foster children. The area in question was zoned as an R–4 residential district, where single-family dwellings were permitted. Under the ordinance the term "family" was defined as " . . . a group of persons living as a single household unit . . ., but not to include more than three persons unrelated by blood, marriage or adoption." The society was required to seek a use certificate since the children were not related by "blood, marriage or adoption." The Commonwealth Court held that the certificate of use should be issued. What is of interest to this discussion is that there was no question raised as to compliance with that portion of the definition of "family" requiring a "single household unit." The lack of a blood or marital relationship between the members of the unit became relevant only because of the specific requirement of the ordinance there in question. We also note that the court in *Children's Aid Society* relied upon a functional analysis of the unit to reach its result. It

determined that the society's proposed use of the property was virtually identical to that which would exist in the case of the permissible use by a family with six children. The fact that public funds subsidized the care of those youngsters was not considered as being relevant to the inquiry.

The functional analysis of the proposed unit was again employed in *Wengert v. Zoning Hearing Board of Upper Merion Township,* 51 Pa.Commw.Ct. 79, 414 A.2d 148 (1980). That decision involved a proposed foster home for troubled adolescents who were referred by the courts. The court in *Wengert* concluded that the proposed use was an institutional home and thus not permitted under the controlling ordinance. *See also Pennsylvania George Junior Republic v. Zoning Hearing Board of Coolspring Township,* 37 Pa.Commw.Ct. 151, 389 A.2d 261 (1978). Here again the functional analysis was employed, and the Commonwealth Court determined that the use in that case was not a family type dwelling but rather an institutional corrective setting. It therefore becomes apparent that the "single housekeeping unit" evolved as a term limiting the use to a unit that functions in the manner of a family residence. It did not require that any particular relationship between the members of the unit be demonstrated as long as a family residential setting was apparent. *Carroll, Berger v. State,* 71 N.J. 206, 364 A.2d 993 (1976); *White Plains v. Ferraioli,* 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756 (1974). This term has been found to exclude arrangements that were primarily established for profit, *Berlin Township v. Christiansen,* 89 N.J.Super. 543, 215 A.2d 593 (1965); or for therapeutic or corrective purposes, *Browndale International, Ltd. v. Board of Adjustment,* 60 Wis.2d 182, 208 N.W.2d 121 (1973), since these settings are not compatible with traditional family settings.

During the hearing before the Board, the appellant offered substantial evidence to establish a caring familial unit. The individuals lived and cooked together as a single housekeeping unit. The same furnishings were throughout the house and the activities of the home were shared in by

all occupants. Each occupant had access to all areas of the premises. There was only one kitchen, the meals were taken by all as a group at one sitting. The group attended social and religious functions together and celebrated holidays jointly. Ms. Anne Henry, a clinical psychiatrist, testified:

> I guess my biggest impression was a boarding house—I figured was [sic] a big house and all these people would be wandering around not knowing anybody. I was very much impressed like I was going into a person's family.
>
> There is a lot of caring and sharing, and it is a really nice experience to visit there.

Record p. 105.

In determining that appellant's residence did not fall within the pre–1978 definition of a single housekeeping unit the Board concluded that it was a commercial type establishment for which she received income and provided services. We are of the view that the facts on this record do not support such a conclusion. In reaching this conclusion the Board and the courts that affirmed that result have made much over the two hundred dollar a month subsidy paid by some of the residents in the home. This rate, particularly in view of the special care these residents require, does not suggest a profit motive. We also note that foster children are subsidized by public funds, and that fact has not been determinative of whether the living arrangement constituted a family unit. Similarly, in family units based upon blood and marital relationships the adult members quite frequently contribute to the maintenance of the unit. The mere fact that a member of the unit pays a fee for belonging to the unit does not transform the relationship unless it also appears that the profit motive is the basis for the relationship.

The lack of permanancy is also cited in support of the position that this household did not constitute a single housekeeping unit. The record reflected that only one of the individuals who currently reside in the premises was a

resident prior to June of 1978. On the other hand it is clear that this is not a transient establishment but rather that the residents usually remain substantial periods of time and move only for health reasons or personal preference. Moreover, the focus for this purpose should be directed to the quality of the relationship during the period of residency rather than its duration.

We also do not accept as valid appellee's argument stressing the special care that is provided these individuals. It is true that the record indicates that many of the residents are elderly or handicapped adults who have no biological family with which to share a home environment. Thus their needs would necessarily be greater than those of the young healthy adult. It is just this kind of support that the traditional family unit is designed to provide. The fact that these individuals may be aged and infirm, and may offend the sensibilities of some, does not warrant the conclusion that their presence is incompatible with the concept of "family." They too should have the right to enjoy their remaining years in the more desirable areas of their community and are fortunate to have access to an environment of the type provided by appellant.

We therefore find that appellant has established a lawful nonconforming use and that the household as described in this record does fall within the definition of a "single housekeeping unit," which was the controlling standard when this use began. We recognize that a community has the right to plan the land uses within its borders, *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Village of Euclid, supra.*, as long as any legitimate use is not improperly excluded, *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977); *Township of Willistown v. Chesterdale Farms, Inc.*, 462 Pa. 445, 341 A.2d 466 (1975); *Southern Burlington County NAACP v. Township of Mount Laurel*, 67 N.J. 151, 336 A.2d 713 (1975). However, zoning restrictions are not to be construed so as to restrict the use of land by implication. *See Fidler v. Zoning Board*

*of Adjustment of Upper Macungie Township*, 408 Pa. 260, 182 A.2d 692 (1962). The Township recognized the inadequacy of its earlier ordinance and has adopted a more specific one to carry out its intended planning for the area.

However, our law has long recognized the priority that must be given to lawful nonconforming uses. *Penn Township v. Yecko Bros.*, 420 Pa. 386, 217 A.2d 171 (1966); *Re Gilfillan's Permit*, 291 Pa. 358, 140 A. 136 (1927).

Accordingly, the order of Commonwealth Court is reversed; and the matter is remanded to the Township Zoning Board of Adjustment with the direction to proceed in accordance with this opinion.