# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| 425 Property Association<br>of Alpha Chi Rho, Inc. | : | |
| | : | |
| | : | No. 1634 C.D. 2018 |
| v. | : | |
| | : | |
| State College Borough<br>Zoning Hearing Board | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| State College Borough, | : | |
| Appellant | : | |
| | : | |
| 425 Property Association | : | |
| of Alpha Chi Rho, Inc., | : | |
| Appellant | : | |
| | : | No. 1659 C.D. 2018 |
| v. | : | |
| | : | Argued:  September 17, 2019 |
| State College Borough | : | |
| Zoning Hearing Board | : | |
| | : | |
| v. | : | |
| | : | |
| State College Borough | : | |

BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge


OPINION BY
JUDGE McCULLOUGH                              FILED:  December 12, 2019


State College Borough (Borough) and 425 Property Association of
Alpha Chi Rho, Inc. (Landowner) each appeal separately from the November 19,

2018 order of the Court of Common Pleas of Centre County (trial court) reversing the decision of the State College Borough Zoning Hearing Board (Board), which upheld a violation relating to an improper fraternity house use. The two appeals have been consolidated.[1]

## Background

Landowner is the owner of property located at 425 Locust Lane (Property) in State College, Pennsylvania. (Board Findings of Fact (F.F.) No. 1.) The Property is located in the R-2 Residential zoning district and contains a three-story building occupied by the fraternity Alpha Chi Rho. (F.F. Nos. 3-4.)

On July 18, 2017, the Vice President for Student Affairs at the Pennsylvania State University (Penn State) sent a one-sentence letter (Penn State Letter) to the Borough purporting to advise the Borough that Penn State had withdrawn recognition of Alpha Chi Rho as a fraternity and identifying the Property as the place where the fraternity resided. (F.F. No. 6.) In response to the Penn State Letter, on July 24, 2017, the Borough sent a letter to Landowner (Borough Letter) notifying it that based upon the action of Penn State, Alpha Chi Rho fraternity was no longer a recognized fraternity pursuant to the Borough zoning ordinance (Zoning Ordinance) and, therefore, the Property was in violation of the zoning ordinance. (F.F. No. 7.) Thereafter, on August 16, 2017, the acting director of Centre Region Code Administration sent a letter to Landowner (Code Administration Letter) advising it that the Property was in violation of the local building safety and property maintenance code for failing to possess a rental housing permit. (F.F. No. 8.) The Code Administration Letter noted that the acting director had observed individuals moving into the building who identified themselves as members of Alpha Chi Rho,

---

[1] The matter was consolidated by order of this Court on January 11, 2019.

2

but that the Property did not possess a valid rental permit. (Reproduced Record (R.R.) at 89a.) Subsequently, on August 17, 2017, the Borough's Zoning Officer issued a notice of violation letter to Landowner alleging the Property was being used as a fraternity house in violation of Section 201 of the Zoning Ordinance.[2] (F.F. No. 9.) The notice of violation stated that although a fraternity house was permitted at the Property, no documentation had been submitted to demonstrate that the current occupant met the definition of a fraternity house under the Zoning Ordinance. (F.F. No. 9; R.R. at 91a.) The Zoning Officer did not conduct an investigation, but rather, based her determination on information she received from the Code Administration Letter and the Penn State Letter. (F.F. Nos. 11-12.)

Landowner appealed the Zoning Officer's determination to the Board on the grounds that (1) the Property had been continuously used and occupied as a fraternity house since the 1920s, which was before the adoption of the Zoning Ordinance and, therefore, constituted a lawful nonconforming use of the Property;

---

[2] Section 201 of the Zoning Ordinance provides, in pertinent part, the following definition of fraternity house:

> **Fraternity House**. An organized living arrangement within a building having common dining and kitchen facilities and multiple bedrooms where residents are students of the Pennsylvania State University (hereinafter called University) and are members of a University recognized fraternity or sorority. University recognition shall be determined by the University through its procedures as may be established from time to time. A recognized fraternity or sorority shall only be in a single location. Property owners seeking designation as a fraternity must submit written confirmation from the University that the sorority or fraternity is recognized. In addition to University recognition, a fraternity or sorority is only permitted in buildings where fraternity occupancy is either currently permitted under the zoning ordinance or is a validly existing non-conforming use as a fraternity or sorority. Fraternities shall be subject to other appropriate municipal regulations.

Zoning Ordinance, §201, (2010), R.R. at 110a.

3

and (2) the definition of "Fraternity House" in the Zoning Ordinance was invalid because the definition impermissibly delegated regulatory and decision-making authority to a third-party entity, *i.e.*, Penn State. (R.R. at 80a.) The Board conducted a hearing on October 24, 2017. At the hearing, Landowner objected to the admission of the Penn State Letter, the Borough Letter, and the Code Administration Letter on hearsay grounds. (Board decision at 9.) The Board overruled the objections because it concluded that formal rules of evidence do not apply in land use cases and that given the issues raised in Landowner's appeal, Landowner did not challenge the fact that Penn State revoked Alpha Chi Rho's recognition and, thus, the letters were introduced for background information only and did not go to the heart of the issue before the Board. *Id.*

Following the hearing, the Board made findings of fact and conclusions of law. The Board found that the version of the Zoning Ordinance that created the R-2 district was adopted in 1959. (F.F. No. 13.) The Board also found that the Zoning Ordinance was amended in 1980 to include a definition of "Fraternity House" for the first time, and that the definition was amended in both 1981 and 2010. (F.F. Nos. 14-15.) The Board noted that although the prior definitions required fraternities to be "affiliated" with Penn State, the 2010 amendment changed the definition to require that fraternities have Penn State "recognition." (F.F. No. 16.)

The Board found that the house on the Property had been built in 1922 for use by Alpha Chi Rho as a fraternity. (F.F. No. 17.) Alpha Chi Rho occupied the Property from 1922 to 1989 but relocated from 1989 to 2003, during which time the Property was occupied by another fraternity. (F.F. Nos. 17-20.) Alpha Chi Rho returned to the Property in 2004. (F.F. No. 21.)

Landowner argued before the Board that the Property's use as a fraternity began long before the Zoning Ordinance was adopted. Since the fraternity use had been created before there was a definition of "Fraternity House," Landowner

4

argued that it should not be bound by the Borough's subsequent attempts to define and curtail its use. Landowner also contended that the 2010 amendment requiring official "recognition" of a fraternity by Penn State should not apply to it because it was not required to be recognized in its prior 88 years of existence.

The Board recognized that it was uncontroverted that Alpha Chi Rho's use of the Property as a fraternity house began well before the creation of the R-2 district and, thus, that Landowner was afforded prior legal nonconforming status. (Board decision at 6.) The Board, however, concluded the Zoning Officer correctly applied the Zoning Ordinance when she issued her notice of violation. *Id.* at 8. The Board determined that Alpha Chi Rho was recognized by Penn State up until July 18, 2017, when its recognition was revoked. *Id.* The Board explained that "[d]espite that fact, the [P]roperty continued to be occupied by a group of individuals. Because they were not recognized by [Penn State], their use of the [P]roperty no longer amounted to a fraternity house." *Id.* With regard to Landowner's nonconforming use argument, the Board held that the Borough had a legitimate interest in preserving the qualities of single-family residential neighborhoods, that it was a "proper exercise of the Borough's police powers to preserve an environment where it [was] safe and appropriate for people to be able to raise a family," and that it "goes without saying that a group of young people living in a communal setting, without controls, is prone to behavior that is less than appropriate for a family setting." *Id.* The Board noted that the Borough must have the authority to amend definitions to address changes in society that occur over time and that to hold otherwise would permit Landowner to change from one nonconforming use to another. *Id.* at 8-9.

With respect to the substantive validity challenge, the Board concluded that the regulation of student housing was a legitimate exercise of the Borough's police power and that the requirement that a fraternity be recognized by Penn State was rationally related to the interests that the Borough sought to address. *Id.* at 13.

5

The Board determined that fraternities have a special status due to their relationship with and the control exercised by universities and that without university recognition a fraternity loses its special status. *Id.* The Board also determined that the Borough could delegate its authority to a government-related entity, such as Penn State. *Id.* at 14.

In sum, the Board concluded that in order to qualify as a Fraternity House, an occupant must be recognized as a fraternity by Penn State, Alpha Chi Rho lost its recognition on July 18, 2017, and Landowner's use no longer qualified as a "Fraternity House" under the Zoning Ordinance. *Id.* at 15. The Board further concluded that the continued occupancy of the Property by students after the fraternity lost its recognition by Penn State violated the requirements of the Zoning Ordinance and that the Zoning Officer correctly determined that the Property was an unlawful use and, therefore, that the occupants were required to vacate the premises. *Id.*

Landowner appealed the Board's decision to the trial court raising the same issues it raised before the Board, as well as reviving its hearsay objections to the three letters. With respect to the hearsay objections, the trial court noted that the Board's overruling of the objections was predicated on its determination that Landowner did not challenge the fact that Penn State had revoked Alpha Chi Rho's recognition and that the appeal was limited to issues concerning Landowner's nonconforming use status and the validity of the Zoning Ordinance. (Trial court op. at 5.) Examining Landowner's appeal documents and its zoning appeal narrative, the trial court agreed that "Landowner did not raise whether Penn State had revoked Alpha Chi Rho's fraternity status as a contested issue in its appeal and application for hearing before the Board." *Id.* Therefore, the trial court agreed that the letters at issue did "not go to the very crux of the issue before the Board, such that corroborative evidence was required as a prerequisite to their admission into

6

evidence." *Id.* Accordingly, the trial court found no abuse of discretion or error of law with respect to the Board's ruling to admit the letters over Landowner's hearsay objections. *Id.*

In addressing Landowner's nonconforming use argument, the trial court relied on *In re Appeal of Miller*, 515 A.2d 904 (Pa. 1986), in which the Pennsylvania Supreme Court rejected a township's attempt to extinguish lawful preexisting uses on a property through amendment of definitions in the township's zoning ordinance. (Trial court op. at 6.) The trial court concluded that the Board's conclusion that the Zoning Ordinance required Penn State recognition of a fraternity in order to qualify as a "Fraternity House" ignored the law of nonconforming uses and the vested rights of Landowner. *Id.* at 7. According to the trial court, a determination as to whether Landowner's use of the Property qualified as a lawful nonconforming use required reference to the ordinance in effect at the time the use was established. *Id.* The trial court concluded that "[a]dherence to subsequently enacted, more restrictive, ordinance provisions, even definitional provisions therein, would run afoul of the well-established law protecting nonconforming preexisting uses." *Id.*

The trial court explained that at the time the Property was first used and established as a fraternity house, there was no R-2 district or zoning ordinance in existence. *Id.* Although the Board stated that Alpha Chi Rho was afforded Penn State recognition up until July 18, 2017, in an apparent attempt to align the present definition of Fraternity House with the acknowledged preexisting, nonconforming use, the trial court concluded that this finding was not supported by substantial evidence in the record. *Id.* at 8. While the building on the Property was constructed in 1922 for use as the Alpha Chi Rho fraternity, the trial court determined there was no evidence in the record that Alpha Chi Rho was officially recognized by Penn State at that time or at any time thereafter. *Id.* According to the trial court, "[t]he

7

first time [Penn State] recognition appear[ed], from the record evidence, to have been considered *vis-à-vis* use of the Property was in connection with the July 18, 2017 letter from Penn State informing the State College Borough Manager that Penn State had withdrawn recognition from Alpha Chi Rho." *Id.* The trial court noted that the Penn State Letter did not state when, or whether, any such recognition had been granted in the first instance. *Id.* Therefore, the trial court held that the idea that Penn State recognition had always been part of the use and was "part and parcel of the nonconforming use [was] not borne out by the record." *Id.*

The trial court also explained that when the Zoning Ordinance was first adopted in the 1950s, there was no definition of "Fraternity House," that there were fraternity houses already existing at that time, including on the Property, and that a definition for Fraternity House was not added to the Zoning Ordinance until 1980. *Id.* at 9. The trial court observed that although "Fraternity House" was previously defined in terms of Penn State "affiliation," it was not until 2010 that the Borough adopted the stricter "Fraternity House" definition requiring Penn State "recognition." *Id.* Ultimately, although the trial court agreed that the Borough asserted a legitimate interest and that it was an appropriate exercise of the Borough's police powers to adopt ordinances that preserve desired qualities in residential neighborhoods, it determined the issue before it was whether the Borough could "extinguish an existing, lawful nonconforming use through adoption of such ordinance." *Id.* Concluding the Borough could not extinguish a lawful nonconforming use, the trial court reversed the Board's decision. *Id.* Because it concluded that the Property qualified as a preexisting nonconforming use, the court declined to address Landowner's argument that the Zoning Ordinance was substantively invalid because it constituted an unlawful delegation of the Borough's police powers. *Id.*

8

**Discussion**

Both the Borough and Landowner appealed the trial court's order.[3] The Borough argues that (1) the trial court erred in relying on *Miller*, by holding that the refinement of the definition of "fraternity" was designed to extinguish the lawful preexisting use status of the property; (2) the trial court exceeded its authority by substituting its findings for those of the Board; and (3) since the trial court did not address the substantive validity challenge, it is improper for this Court to address the issue.[4] The Board makes similar arguments in support of the Borough's appeal, arguing that (1) the trial court erred when it held that the Board's decision ignored the law of nonconforming uses and the vested property rights of Landowner; and (2) the trial court erred in relying on *Miller*.

In its appeal, Landowner contends (1) the trial court abused its discretion and committed an error of law by admitting the three letters over its hearsay objections; (2) the trial court correctly determined that Landowner's preexisting nonconforming status protects it from the subsequently enacted requirements of the Zoning Ordinance; and (3) the trial court committed an error of law in failing to reverse the Board's decision to deny the validity challenge.

**A. The Admission of the Three Letters**

We first address Landowner's hearsay challenge. Landowner argues that under the rules governing hearsay evidence in zoning appeals, such evidence

---

[3] Where, as here, the trial court takes no additional evidence, our scope of review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Hamilton Hills Group, LLC v. Hamilton Township Zoning Hearing Board*, 4 A.3d 788, 792 n.6 (Pa. Cmwlth. 2010).

[4] Penn State filed an amicus curiae brief in support of the Borough.

must be sufficiently corroborated to be considered competent. Landowner contends that no witnesses corroborated any portion of the three letters. Landowner notes that the notice of violation issued was based entirely on information received in the letters and that the Zoning Officer did not conduct an independent investigation. Landowner contends that the only evidence presented in support of the violation was hearsay evidence. Rather than constituting mere "background" information, as found by the Board, Landowner maintains that the letters were the only information the Zoning Officer possessed and were the sole basis for issuing the notice of violation. Landowner also argues that it was entitled to cross-examine adverse witnesses. Because the writers of the letters were not called as witnesses, Landowner did not have an opportunity to cross-examine regarding the content of the letters.

Initially, we note that section 908(6) of the Municipalities Planning Code (MPC)[5] provides that in Board hearings, "[f]ormal rules of evidence shall not apply, but irrelevant, immaterial, or unduly repetitious evidence may be excluded." 53 P.S. §10908(6). Although the Board is not bound by formal hearsay evidence rules, *Town & Country Management Corp. v. Zoning Hearing Board of Borough of Emmaus*, 671 A.2d 790, 792 (Pa. Cmwlth. 1996), hearsay evidence "must be sufficiently corroborated by other evidence in order to be considered competent evidence," *Lake Adventure Community Association, Inc. v. Dingman Township Zoning Hearing Board*, 79 A.3d 708, 714 n.4 (Pa. Cmwlth. 2013). Additionally, in Board hearings, "[t]he parties . . . shall be afforded the opportunity to respond and present evidence and argument and cross-examine adverse witnesses on all **relevant** issues." Section 908(5) of the MPC, 53 P.S. §10908(5) (emphasis added).

Regarding hearsay, the Pennsylvania Rules of Evidence defines "hearsay" as a "statement that (1) the declarant does not make while testifying at the

---

[5] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10908(6).

10

current trial or hearing; and (2) a party offers in evidence **to prove the truth of the matter asserted in the statement**." Pa.R.E. 801(c) (emphasis added). Testimony is not hearsay if "offered **not** to prove the truth of the statement made by the out-of-court declarant, but instead to prove that the statement was in fact made." *Duffy v. Department of Transportation, Bureau of Driver Licensing*, 694 A.2d 6, 9 (Pa. Cmwlth. 1997) (emphasis in original); *see also Commonwealth v. Wright*, 317 A.2d 271, 273 (Pa. 1974) (same); *Bachman v. Artinger*, 426 A.2d 702, 705 (Pa. Super. 1981) (same). Similarly, "an out-of-court statement offered to explain a course of conduct is not hearsay," *Jerry v. Department of Corrections*, 990 A.2d 112, 116 (Pa. Cmwlth. 2010), as is a statement admitted not for its truth, but instead for its effect on the listener, *Architectural Testing, Inc. v. Unemployment Compensation Board of Review*, 940 A.2d 1277, 1282 (Pa. Cmwlth. 2008).

Here, in its appeal to the Board, Landowner did not challenge the underlying facts discussed in the three letters, *i.e.*, that Penn State revoked its recognition of Alpha Chi Rho and that the property was in violation of the Zoning Ordinance for not possessing a valid rental permit. Instead, the appeal only raised legal issues, including the Property's nonconforming use status and the substantive validity of the Zoning Ordinance. *See* R.R. at 73a, 78a. Because Landowner did not challenge the underlying facts that supported a zoning violation finding, the letters were mainly introduced to explain the Borough's course of conduct and their effect on the Borough. Since the letters were not introduced to prove the truth of the matter asserted in the letters, the statements contained therein were not hearsay and the Borough was not required to offer corroborating evidence. Similarly, because Landowner does not challenge the basic facts supporting the violation, the statements contained in the letters were **not relevant** to its appeal and it was not necessary for it to cross-examine the authors of the letters. *See* Section 908(5) of the MPC, 53 P.S. §10908(5).

11

Additionally, from our review of the record, there does appear to be evidence corroborating the statements contained in the letters. At the hearing, Victor Ramos, Landowner's president, testified on behalf of Landowner. (R.R. at 203a, 214a.) Mr. Ramos stated that when he visited the Property on September 1, 2017, the house was occupied by undergraduate members of Alpha Chi Rho. (R.R. at 215a-216a.) He also testified that the members moved into the house in the middle of August 2017. (R.R. at 217a.) Mr. Ramos also stated that Penn State had revoked its recognition of Alpha Chi Rho and that he learned of it from a letter he received from Penn State that was dated July 18, 2017. (R.R. at 222a-26a.) Accordingly, the testimony of Mr. Ramos corroborated the information contained in the three letters.

### B. Nonconforming Use

Next, we address whether the trial court erred in holding that the Board's decision misapplied the law of nonconforming use and whether the trial court erred in relying on *Miller* to reach its conclusion. The Borough maintains that the trial court erred in relying on *Miller* because, unlike *Miller* where a township sought to extinguish a lawfully existing nonconforming use, here, the Board did not extinguish the lawful nonconforming use status of the Property, but only required that a fraternity recognized by Penn State occupy it. The Borough explains that in *Miller*, the township changed the definition of "family" in its zoning ordinance so that the property at issue could no longer be used as a "group home." In contrast, here, clarification of the word "fraternity" was not an attempt to zone fraternities out of existence. The Borough argues that regardless of what definition of "Fraternity House" is considered, some relationship beyond that of fraternity member enrollment at Penn State "is required for the fraternity to fall under the definition within the Zoning Ordinance. To hold any differently would be to allow for the promulgation of chaos and the ability for any group of people to cohabitate and call

12

themselves a 'fraternity.'" (Borough's Br. at 14.) Because Penn State withdrew its recognition of Alpha Chi Rho, the Borough argues that the Property no longer complies with the definition of "Fraternity House" in the Zoning Ordinance.

Similarly, the Board argues that the Borough was well within its police powers to amend the definition of "Fraternity House" in the Zoning Ordinance to protect the residential neighborhood in which fraternities are located and that "[s]uch flexibility is necessary given that behavioral characteristics of individuals occupying fraternities has changed over the years." (Board's Br. at 10.) The Board also notes that Landowner still has the opportunity to rent the Property to another fraternity, as long as it is recognized by Penn State. Additionally, the Board maintains that the 2010 amendment to the definition of "Fraternity House" in the Zoning Ordinance did not have the immediate effect of prohibiting the use of the Property as a fraternity house; rather, it argues that the Property only ceased to qualify as a "Fraternity House" in 2017 when Penn State withdrew its recognition. The Board contends that, in essence, the trial court's decision changes the use of the Property from that of a fraternity house to that of a rooming house, even though a rooming house is not permitted in the R-2 district and the Property does not have nonconforming use status as a rooming house.[6]

Conversely, Landowner argues that the owner of a property to which a lawful nonconforming use has attached enjoys a vested property right to the continuation of that use. Landowner contends that the municipalities lack the power

---

[6] Penn State, in large part, makes similar arguments as the Borough and Board in its amicus curiae brief. Additionally, Penn State argues that the trial court's decision conflicts with the interests of Penn State and its students because it is at odds with Penn State's efforts to promote a Greek life system which operates under the supervision of Penn State in cooperation with its students and national fraternity organizations with whom local fraternity chapters are affiliated. Penn State also contends that the trial court's ruling undermines the effectiveness of its enforcement actions to sanction inappropriate behavior by fraternities and sororities.

to compel a change in the nature of an existing lawful use of property. Landowner notes that the Property was used as a fraternity house for decades before the Borough added the current definition for "Fraternity House" in 2010. Because of this, Landowner maintains that its use of the Property as a fraternity is a lawful, preexisting nonconforming use and its continuation is afforded constitutional protection.

Landowner argues that the trial court correctly applied *Miller*, which it maintains held that the proper definition to be applied is the definition that existed at the time the preexisting nonconforming use began. It argues that adding the Penn State recognition requirement to the Property changes the definition of Fraternity House and renders the use that previously existed on the Property unlawful. Landowner also alleges that it is not necessary to require Penn State recognition of a fraternity in order to avoid the chaos the Borough alleges would happen, because a fraternity house is not a new concept, but rather, is a concept that existed long before the adoption of the Zoning Ordinance.

> The MPC defines nonconforming use as follows:

> [A] use, whether of land or of structure, which does not comply with the applicable use provisions in a zoning ordinance or amendment heretofore or hereafter enacted, where such use was lawfully in existence prior to the enactment of such ordinance or amendment, or prior to the application of such ordinance or amendment to its location by reason of annexation.

Section 107 of the MPC, 53 P.S. §10107; *see also DoMiJo, LLC v. McLain*, 41 A.3d 967, 972 (Pa. Cmwlth. 2012) ("A lawful nonconforming use is a use predating the enactment of a prohibitory zoning restriction."). "A pre-existing nonconforming use arises when a lawful use is subsequently barred by a change in the zoning ordinance." *Hager v. West Rockhill Township Zoning Hearing Board*, 795 A.2d

14

1104, 1110 (Pa. Cmwlth. 2002). However, "[t]he right to maintain a pre-existing nonconformity is available only for uses that were lawful when they came into existence and which existed when the ordinance took effect." *Id.*

When a lawful nonconforming use exists, "the right to continue such use is afforded the constitutional protections of due process." *DoMiJo*, 41 A.3d at 972. Thus, "[a] municipality is without power to compel a change in the nature of a use where property was not restricted when purchased and is being used for a lawful use." *Paulson v. Zoning Hearing Board of Wallace Township*, 712 A.2d 785, 788, (Pa. Cmwlth. 1998). Further, "a property owner's right to continue operating a legal nonconforming use on its property is an interest that runs with the land, so long as it is not abandoned." *DoMiJo*, 41 A.3d at 972; *see also Eitner v. Kreitz Corp.*, 172 A.2d 320, 323 (Pa. 1961) (holding that "[t]he right to continue the nonconforming use, once established and not abandoned, runs with the land and this right is not confined to any one individual or corporation. A vested right, unless abandoned, to continue the nonconforming use is in the land").

In *Miller*, the landowner operated a group home for handicapped individuals in her house. 515 A.2d at 905. When the landowner first began operating the group home, it complied with the relevant zoning ordinance's definition of "family," which was defined as "any number of persons living and cooking together as a single housekeeping unit." *Id.* However, several years after starting the group home, the definition of "family" was changed to "one or more persons related by blood, adoption or marriage living together as a single housekeeping unit" and "not more than two persons living and cooking together who are not related-by-blood, adoption or marriage." *Id.* Thereafter, the township zoning officer notified the landowner that she was in violation of the zoning ordinance. *Id.*

On appeal, the landowner argued that her property was a lawful, nonconforming use. *Id.* at 906. Our Supreme Court's resolution of the issue focused

15

on the definition of "family" as used in the original ordinance and the meaning of the term "single housekeeping unit" as used in that definition. *Id.* The Court noted that there was substantial evidence in the record that the home's residents existed as a caring familial unit and lived and cooked together as a "single housekeeping unit." *Id.* at 908. Therefore, the Court concluded that the landowner had established "a lawful nonconforming use and that the household as described in [the] record [fell] within the definition of a 'single housekeeping unit,' which was the controlling standard when this use began." *Id.* at 909. While the Court recognized that a community has the right to create land uses, it held that "zoning restrictions are not to be construed so as to restrict the use of land by implication." *Id.* Although the township determined its earlier ordinance was inadequate and had adopted a more specific one to carry out its intended planning for the area, the Court held that under our law priority "must be given to lawful nonconforming uses." *Id.*; *see also Strauss v. Zoning Hearing Board of Haverford Township*, 608 A.2d 1105, 1106, 1109 (Pa. Cmwlth. 1992) (holding that because the landowner presented substantial evidence that her use of a property fit within the family dwelling definition of an earlier ordinance, the property had legal nonconforming use status and the township could not apply a new, more restrictive definition in the ordinance to the property).

Here, a fraternity house was first constructed on the Property in 1922 and the Property has been continuously used by a fraternity since then. (F.F. Nos. 17-21.) Alpha Chi Rho occupied the Property from 1922 until 1989 and from 2004 until the present. (F.F. Nos. 18, 21.) In 1959, the Zoning Ordinance creating the R-2 district, in which the Property is located, was adopted; in 1980 the Zoning Ordinance was amended to include a definition of "Fraternity House" for the first time. (F.F. Nos. 3, 13-14.) The definition of "Fraternity House" was later amended in 1981. (F.F. No. 1981.) The 1981 "Fraternity House" definition provided, in pertinent part, as follows:

16

> **Fraternity House**: A building designed for use as a residence of students or members **of a Pennsylvania State University—affiliated fraternity or sorority**, and which has only one dining facility and one kitchen. Such definition is intended to include any building originally designed and constructed for such purposes or any structure converted to such use. The term is intended to include not only buildings occupied by men students, commonly called "fraternities," but also buildings occupied by women, commonly called "sororities." Renters may be housed in the building, but the number of renters shall not exceed the number of members residing in the building, except for the summer months (June through August).

*Former* Zoning Ordinance, §201, R.R. at 114a (emphasis added). The definition of "Fraternity House" was again amended in 2010 to provide, in part, the following definition:

> **Fraternity House**. An organized living arrangement within a building having common dining and kitchen facilities and multiple bedrooms **where residents are students of the Pennsylvania State University (hereinafter called University) and are members of a University recognized fraternity or sorority. University recognition shall be determined by the University through its procedures as may be established from time to time**. A recognized fraternity or sorority shall only be in a single location. Property owners seeking designation as a fraternity must submit written confirmation from the University that the sorority or fraternity is recognized. In addition to University recognition, a fraternity or sorority is only permitted in buildings where fraternity occupancy is either currently permitted under the zoning ordinance or is a validly existing non-conforming use as a fraternity or sorority. Fraternities shall be subject to other appropriate municipal regulations.

17

Zoning Ordinance, §201, R.R. at 110a (emphasis added).

We agree with the trial court that Landowner's prior use of the Property as a fraternity house entitles it to lawful nonconforming use status. When use of the Property as a fraternity house was first established, there was no R-2 district in the Zoning Ordinance. Later, when the version of the Zoning Ordinance creating the R-2 district was first adopted in 1959, there was no definition for "Fraternity House." Only in 1980 did the Borough first adopt a definition of "Fraternity House," which was less restrictive than the current definition of Fraternity House, merely requiring Penn State "affiliation" as opposed to "recognition." Because the Property was used as a fraternity house for decades before the Borough added the current definition for "Fraternity House" to the Zoning Ordinance, use of the Property as a fraternity house is a lawful, preexisting nonconforming use.[7]

---

[7] On a related note, the Borough also argues that the trial court substituted its own factual findings and conclusions of law for those of the Board, regarding the nonconforming use status of the Property. Specifically, the Borough argues that the trial court made its own factual finding that the first time Penn State recognition of the Property was considered was vis-à-vis the Penn State Letter. The Borough contends that there is substantial evidence in the record that the group of men occupying the fraternity had, prior to the issuance of the Penn State Letter, always been members of a fraternity recognized by and/or affiliated with Penn State, regardless of the definition that existed in the Zoning Ordinance. The Borough maintains that there is substantial evidence in the record that the men inhabiting the Property were not in a group that was recognized by or affiliated with Penn State at the time the violation was issued.

When reviewing a zoning hearing board decision, "a court may not substitute its judgment for that of the board; and, assuming the record demonstrates substantial evidence, the court is bound by the board's findings which result from resolutions of credibility and the weighing of evidence rather than a capricious disregard for the evidence." *Zoning Hearing Board of Sadsbury Township v. Board of Supervisors of Sadsbury Township*, 804 A.2d 1274, 1278 (Pa. Cmwlth. 2002). Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* Here, the Board found that "Alpha Chi Rho was accorded [Penn State] recognition up until July 18, 2017. At that time [Penn State] recognition was revoked." (Board decision at 8.) It is unclear if the Board found that Alpha Chi Rho had continuous recognition until July 2017, or just that Alpha Chi Rho was recognized immediately prior to the revocation. Regardless, the Borough has not pointed to any evidence in the record to support a conclusion regarding Penn State's recognition prior to July 2017. Based on our review, the only evidence in the record regarding Penn State's recognition of Alpha Chi Rho was that

18

The Borough attempts to distinguish the instant case from *Miller* by arguing that, unlike the situation in *Miller*, where the township sought to extinguish a preexisting nonconforming use, here, the Borough did not seek to extinguish the continued use of properties as fraternity houses. However, we conclude that such distinction is of no consequence and that *Miller* is directly on point. *Miller* does not only apply when a municipality seeks to extinguish a use. Rather, *Miller* stands for the proposition that once a municipality adopts new zoning regulations, preexisting uses of property are afforded lawful nonconforming use status and may not be restricted based on subsequently enacted zoning regulations. Like *Miller*, where our Supreme Court held that a township was not permitted to apply a more restrictive definition of "family" to a preexisting use, here, the Borough was not permitted to apply a more restrictive definition to a "Fraternity House" than that which existed when use of the Property as a fraternity house was first established.

The Borough and Board also argue that the Property could be rented to another fraternity as long as it is recognized by Penn State. This argument is, to some extent, a red herring. In *Miller*, the landowner could have presumably rented to tenants who fit within the revised definition of "family"; however, this possibility did not affect our Supreme Court's analysis. Here, the fact that Landowner could rent to another fraternity that fits within the 2010 definition of "Fraternity House" has no relevance to whether the Property is entitled to nonconforming use status. The Board also argues that the trial court's decision impermissibly allows the use of

_____

recognition was revoked in July 2017; however, there is no evidence in the record regarding **when** Penn State first officially recognized Alpha Chi Rho. Thus, we agree with the trial court that there is no evidence in the record from which a reasonable mind could accept as adequate to support a finding that Alpha Chi Rho was accorded Penn State "recognition up until July 18, 2017," that Alpha Chi Rho was recognized by Penn State when established in 1922, or at some point thereafter, or that Penn State recognition "has always been part of the use" of the Property. (Trial court op. at 8.)

the Property to change from a fraternity house to a rooming house; however, the Board's argument lacks merit given that every fraternity house also functions as a rooming house.[8]

Since the Property had been used as a fraternity house long before the Borough adopted the more restrictive 2010 definition of "Fraternity House," use of the Property as a fraternity house is a lawful nonconforming use that Landowner is entitled to continue. While we understand the Borough's desire to protect the residential characteristics of the neighborhoods where fraternities are located, such public policy concerns do not authorize the Borough to compel a change in the nature of an existing lawful use of the Property.[9]

---

[8] *See* Zoning Ordinance, §201 (defining "rooming house" as "[a]ny building or portion thereof in which lodging is provided for more than four lodgers or guests for seven consecutive days or more and for compensation. The term 'rooming house' shall be deemed to include: lodging house and boarding house, but not hotel, tourist home, or automobile court").

[9] Because we conclude that use of the Property as a fraternity house was a lawful nonconforming use, it is unnecessary to address whether the Zoning Ordinance is substantively invalid due to impermissibly delegating regulatory and decision-making powers to Penn State. However, were we to address this issue we would conclude that the Borough has unconstitutionally delegated its authority to determine the existence of a "Fraternity House" under the Zoning Code.

Under Article II, Section 1 of the Pennsylvania Constitution, "[t]he legislative power of the Commonwealth shall be vested in a General Assembly." Pa. Const. art. II, §1. Therefore, "when the General Assembly empowers some other branch or body to act, our jurisprudence requires that the basic policy involved in legislative power actually be made by the legislature as constitutionally mandated." *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827, 833 (Pa. 2017) (internal quotation marks omitted). This is to ensure that "duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate," and also "to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power." *Id.*

In general, although the Pennsylvania Constitution "forbids the delegation of 'legislative power,' it nonetheless permits the General Assembly, in some instances, to assign the authority and discretion to execute or administer a law." *Id.* However, the Supreme Court has concluded the Constitution imposes two fundamental limitations on the General Assembly's ability to do so. *Id.* at 834. First, "the General Assembly must make the basic policy choices, and second, the legislation must include adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Id.* (internal quotation marks omitted). This means that "the law must contain some intelligible principle to which the person or body authorized to act is

directed to conform." *Id.* (internal quotation marks omitted). As our Supreme Court has held, a permissible delegation of legislative authority must include concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making, such as a requirement that the delegate hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion subject to judicial review. *Id.* at 835. This Court has held that the non-delegation principle applies equally to a municipality's ability to delegate administrative functions to a third party. *See City of Williamsport Bureau of Codes v. DeRaffele*, 170 A.3d 1270, 1275 (Pa. Cmwlth. 2017).

In *Protz*, the Supreme Court addressed the constitutionality of a provision in the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2710, that required physicians performing impairment rating evaluations of workers' compensation claimants to apply the methodology provided in the "most recent edition" of the American Medical Association (AMA) Guides to the Permanent Evaluation of Permanent Impairment (Guides). *Protz*, 161 A.3d at 830-31. The Supreme Court concluded that the General Assembly's delegation of authority to the AMA failed to provide any of the necessary safeguards. *Id.* at 835. In particular, the Court concluded that "the General Assembly did not favor any particular policies relative to the Guides' methodology for grading impairments, nor did it prescribe any standards to create such a methodology." *Id.* Without any parameters, the AMA would be free to adopt any formula for impairment ratings and could change the formula at will, potentially with such frequency that no one could keep up with the changes, or alternatively, with such infrequency as to fall behind recent medical advances. *Id.* The Court also found that the General Assembly did not include any of the procedural mechanisms that are considered necessary to protect against "administrative arbitrariness and caprice," such as requiring the AMA to "hold hearings, accept public comments, or explain the grounds for its methodology in a reasoned opinion, which then could be subject to judicial review." *Id.* at 836. Thus, the Court concluded that the General Assembly unconstitutionally delegated lawmaking authority to the AMA. *Id.* at 838.

Here, like *Protz*, the Zoning Ordinance unconstitutionally delegates authority to Penn State to decide whether a property may be used as a "Fraternity House" under the Zoning Ordinance. The Zoning Ordinance provides that a "Fraternity House" is a student living arrangement where residents are members of a Penn State "recognized fraternity or sorority" and that "recognition shall be determined by [Penn State] **through its procedures as may be established from time to time**." Zoning Ordinance, §201, R.R. at 110a (emphasis added). Similar to *Protz*, the Zoning Ordinance provides none of the necessary safeguards to "guide and restrain the exercise" of the administrative functions delegated to Penn State. *Protz*, 161 A.3d at 834. Specifically, the Zoning Ordinance neither outlines the policy preferences favored by the Borough with respect to fraternity recognition, nor provides standards to guide Penn State in determining its recognition of fraternities as it relates to the Zoning Ordinance. Under the Zoning Ordinance, Penn State has sole and unbridled discretion regarding the recognition of fraternities and may revoke recognition at will. There are also no procedural mechanisms in the Zoning Ordinance to protect against Penn State exercising "administrative arbitrariness and caprice." *Id.* at 836. Accordingly, because the Borough's delegation of authority to Penn State contained none of the "fundamental limitations," *id.* at 834, that our Supreme Court has deemed necessary to pass constitutional muster, were we to address the issue, we would be constrained to conclude that section 201 of the Zoning Ordinance constitutes an unconstitutional delegation of lawmaking authority.

21

## Conclusion

Because the existence of a fraternity house on the Property prior to the 2010 Zoning Ordinance amendment entitled the Property to nonconforming use status, we affirm the order of the trial court.[10]

_____
PATRICIA A. McCULLOUGH, Judge

Judge Cohn Jubelirer did not participate in this decision.

---

[10] While we appreciate the Borough's and Penn State's attempt to restrict and curtail inappropriate, disapproved, and dangerous social behaviors occurring at fraternities and sororities, these concerns do not provide a sufficient basis for upholding the Board's actions. However, we note that our disposition in this case is not intended to, and does not restrict, the ability of the Borough or Penn State to curtail activities of fraternities and sororities by lawful means.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

425 Property Association : 
of Alpha Chi Rho, Inc. : 
                 : No. 1634 C.D. 2018
          v. : 
                 : 
State College Borough : 
Zoning Hearing Board : 
                 : 
          v. : 
                 : 
State College Borough, : 
                 Appellant : 
                 : 
425 Property Association : 
of Alpha Chi Rho, Inc., : 
                 Appellant : 
                 : No. 1659 C.D. 2018
          v. : 
                 : 
State College Borough : 
Zoning Hearing Board : 
                 : 
          v. : 
                 : 
State College Borough : 

## ***<u>ORDER</u>***

AND NOW, this 12th day of December, 2019, the November 19, 2018 order of the Centre County Court of Common Pleas is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge